WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Attorneys for Defendants
3 Gannett Drive
White Plains, NY 10604
(914) 323-7000
Attn:  Peter A. Meisels (PM-5018)
       Lalit K. Loomba (LL-9755)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x   07 Civ. 1296 (CLB)
ARAZ ALALI,

                              Plaintiff,

                                                    **DECLARATION OF**
          -against-                                 **LALIT K. LOOMBA, ESQ.**

ROBERT GAZZOLA, individually, PATRICK J.
CARROLL, individually, and the CITY OF NEW
ROCHELLE, New York,

                              Defendants.
------------------------------------------------------------x

      LALIT K. LOOMBA, an attorney admitted to practice law before the Courts of the State

of New York and the United States District Court for the Southern District of New York, hereby

declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am an associate with the firm of Wilson, Elser, Moskowitz, Edelman & Dicker

LLP.  I submit this declaration in support of the motion by defendants Robert Gazzola

("Gazzola"), Patrick J. Carroll ("Carroll"), and the City of New Rochelle (collectively, the

"Defendants") for summary judgment on grounds of absolute and qualified immunity.

      1.     Annexed hereto as Exhibit A is copy of the letter from the New Rochelle Police

Department ("NRPD") appointing plaintiff Araz Alali ("Alali") as an officer.

      2.     Annexed hereto as Exhibit B are relevant pages from the sworn deposition of

plaintiff Araz Alali taken on June 25, 2007 and continued on July 10, 2007.

1616890.1

3.     Annexed hereto as Exhibit C is a NRPD command discipline report under which Alali received a letter of reprimand for an incident occurring on August 1, 2002.

4.     Annexed hereto as Exhibit D is a copy of Section 8.2 of the NRPD Rules and Regulations.

5.     Annexed hereto as Exhibit E is NRPD command discipline report under which Alali received a letter of reprimand for an incident occurring on October 29, 2002.

6.     Annexed hereto as Exhibit F is a copy of Section 1.5 of the NRPD Rules and Regulations.

7.     Annexed hereto as Exhibit G is a NRPD command discipline report under which Alali lost one (1) leave day for an incident occurring on December 23, 2002.

8.     Annexed hereto as Exhibit H is a copy of Section 1.9 of the NRPD Rules and Regulations.

9.     Annexed hereto as Exhibit I is a NRPD command discipline report under which Alali received a letter of reprimand for an incident occurring on January 19, 2005.

10.     Annexed hereto as Exhibit J is a copy of Chapter 2, Article 2.03, of the NRPD Manual of Procedure.

11.     Annexed hereto as Exhibit K is a NRPD command discipline report under which Alali lost two (2) leave days for an incident occurring on April 14, 2005.

12.     Annexed hereto as Exhibit L is a copy of Section 2.3 of the NRPD Rules and Regulations.

13.     Annexed hereto as Exhibit M  is a command discipline report under which Alali was offered the loss of one (1) leave day, in lieu of formal disciplinary charges and a hearing, for an incident occurring on June 15, 2006.

- 2 -

1616890.1

14.    Annexed hereto as Exhibit N is a copy of the charges and specifications against Alali signed by Captain Robert Gazzola on February 15, 2007.

15.    Annexed hereto as Exhibit O is a copy of Alali's performance evaluation for the period November 26 through December 31, 2004.

16.    Annexed hereto as Exhibit P is a copy of the "letter of counsel" dated September 29, 2005.

17.    Annexed hereto as Exhibit Q is a copy of Alali's performance evaluation for the period January 1 through December 31, 2005.

18.    Annexed hereto as Exhibit R is a copy of Alali's interim performance evaluation for the period January 1 through May 31, 2006.

19.    Annexed hereto as Exhibit S is a copy of Alali's performance evaluation for the period January 1 through December 31, 2006.

20.    Annexed hereto as Exhibit T is a copy of Alali's interim performance evaluation for the period January 1 through May 31, 2007.

21.    Annexed hereto as Exhibit U is a copy of a memorandum from Captain Gazzola dated July 25, 2007.

22.    Annexed hereto as Exhibit V is a copy of Section 13.1 from the NRPD Administrative Manual.

23.    Annexed hereto as Exhibit W is a copy of DVD video taken from Alali's police vehicle on June 15, 2006.

24.    Annexed hereto as Exhibit X is a copy of Article 2.11 of the NRPD Manual of Procedure.

1616890.1

25.     Annexed hereto as Exhibit Y is a copy of a document listing the NRPD officers who were assigned to attend a seminar entitled "Tools for Tolerance" in October and November 2005, as well as a brief description of the seminar.

26.     Annexed hereto as Exhibit Z are relevant pages of the NRPD "Post Patrol Book."

27.     Annexed hereto as Exhibit AA are relevant pages from the agreement between the City of New Rochelle and the New Rochelle Police Association effective January 1, 2005.

28.     Annexed hereto as Exhibit BB is a copy of an EEOC Charge purportedly signed by Alali on February 12, 2007.

29.     Upon information and belief, the EEOC has not issued a right-to-sue letter in connection with the EEOC Charge annexed as Exhibit BB.

30.     Annexed hereto as Exhibit CC is a copy of the complaint in this action.

31.     Annexed hereto as Exhibit DD is a copy of Defendants' answer.

32.     Annexed hereto as Exhibit EE is a copy of the civil case discovery plan and scheduling order entered May 25, 2007.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 2, 2007.

Lalit K. Loomba

1616890.1

Office of the Police Commissioner
475 North Avenue
New Rochelle, NY 10801

Patrick J. Carroll
Commissioner



# City of New Rochelle
# New York

February 1, 2002

Mr. Araz Alali
828 Pelhamdale Avenue, #1
New Rochelle, New York  10801

Dear Mr. Alali:

I wish to inform you that your effective date of employment with the New Rochelle Police Department is Sunday, February 10, 2002.

You are to report to Lieutenant Cosmo Costa at 9:00 AM on Wednesday, February 6, 2002, to be sworn in, measured for uniforms, etc. Please bring a copy of your Certificate of Completion of the New York City Police Academy course with you.

Once again, I wish to take this opportunity to congratulate you and welcome you to the Department.

Sincerely,

Patrick J. Carroll
Police Commissioner

/ays



DEFENDANT'S
EXHIBIT
KK

1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2   -----------------------------------------X

3   ARAZ ALALI,

4                           Plaintiff,

5          -against-

6   ROBERT GAZZOLA, INDIVIDUALLY,

    PATRICK J. CARROLL,

7   INDIVIDUALLY, AND THE CITY OF

    NEW ROCHELLE, NEW YORK,

8

                            Defendants.

9   -----------------------------------------X

10                  Wilson Elser Moskowitz Edelman & Dicker, LLP

                    3 Gannett Drive, 4th Floor

11                  White Plains, New York  10604

                    June 25, 2007

12                  1:15 PM

13

14

15

16

            Examination before Trial of PLAINTIFF,

17

    ARAZ ALALI, held pursuant to Notice, at the above

18

    time and place, before Susie Cabanas-Diaz, a Notary

19

    Public of the State of New York.

20

21

22

23

24

2    A P P E A R A N C E S :

3              LOVETT & GOULD, LLP
               Attorneys for Plaintiff
4              222 Bloomingdale Road
               White Plains, New York  10605-1513
5              BY: JONATHAN LOVETT, ESQ.
               Email: jlovett@lovett-gould.com

6

7              WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
               Attorneys for Defendants
8              3 Gannett Drive
               White Plains, New York  10604-3407
9              BY: PETER A. MEISELS, ESQ.
               Email: peter.meisels@wilsonelser.com

10

11

ALSO PRESENT:

12

Lalit K. Loomba, Esq.

13   Wilson Elser Moskowitz Edelman & Dicker, LLP

14

15

16

17

18

19

20

21

22

23

24

25

2          IT IS HEREBY STIPULATED AND AGREED, by

3     and between the attorneys for the respective

4     parties hereto, that this examination may be

5     sworn to before any Notary Public.

6

7          IT IS FURTHER STIPULATED AND AGREED that

8     the sealing and filing of the said examination

9     shall be waived.

10

11          IT IS FURTHER STIPULATED AND AGREED that

12     all objections to questions except as to form

13     shall be reserved for trial.

14

15

16

17

18

19

20

21

22

23

24

25

13

ARAZ ALALI

1

2    descent.  No, I do not.

3        Q    Not Caucasian?

4        A    No.

5        Q    Referring to paragraph eight of your

6    complaint where it says, "In that connection,

7    plaintiff has, to defendants' knowledge and/or at

8    their direction and/or with their active

9    encouragement and condonation."

10            Now, that paragraph when you

11   reference defendants, who do you mean?

12       A    Defendants as being Robert Gazzola,

13   Commissioner Carroll.

14       Q    And let's take a look at the first

15   subdivision of paragraph A where it says,

16   "Repeatedly addressed as terrorist, Ali Baba, Camel

17   Jockey and, inter alia, Ali -- repeatedly addressed

18   as terrorist, Ali Baba, Camel Jockey and, inter

19   alia, Ali."

20            Who in the department ever addressed

21   you as being a terrorist?

22       A    That would be Captain Gazzola.

23       Q    He told you you were a terrorist?

24       A    And other supervisors.

25       Q    Let's start with Mr. Gazzola.  When did he

14

ARAZ ALALI

1

2  refer to you as a terrorist?

3      A    I would have to -- I don't presently

4  recall.  I would have to refresh my memory.

5      Q    Is there anything that you could use that

6  would refresh your memory?

7      A    I'm sure there is.

8      Q    What would that be?

9      A    Talking to counsel.

10     Q    Is there anything else that would refresh

11  your memory other than speaking with counsel?

12     A    Not right now.

13     Q    At any time?

14     A    I believe no.  Not right now or at any

15  time.

16     Q    Do you keep a memo book?

17     A    Yes, I do.

18     Q    Would that memo book indicate when that

19  happened?

20     A    I don't presently recall.

21     Q    Do you keep that memo book for every day

22  that you're on duty?

23     A    Yes.

24     Q    At the time that Captain Gazzola referred

25  to you as a terrorist, was anyone else present?

15

ARAZ ALALI

1

2    A    I don't presently recall.

3    Q    Where did that occur?

4    A    In the police station.

5    Q    Where in the police station?

6    A    I don't presently recall.

7    Q    And on how many occasions did it occur?

8    A    I don't presently recall.

9    Q    Did you make any note about that

10   occurrence when it happened?

11   A    I don't presently recall.

12   Q    Is there anything about Captain Gazzola's

13   having called you a terrorist that you can recall

14   that I haven't asked you?

15   A    I don't recall.

16   Q    Your complaint talks about being referred

17   to as Ali Baba.  Can you identify the city employees

18   that referred to you as Ali Baba?

19   A    I don't presently recall.

20   Q    Just back up a little bit.  You mentioned

21   in reference to the word terrorist that there were

22   other supervisors that used that term besides

23   Captain Gazzola, is that correct?

24   A    Correct.

25   Q    Can you identify who those persons are?

16

ARAZ ALALI

1

2     A    I don't presently recall.

3     Q    Now, in reference to the term Camel

4  Jockey, can you identify the city employees that

5  referred to you as the Camel Jockey?

6     A    Yes.

7     Q    Who were they?

8     A    I don't presently recall.

9     Q    Do you recall when they referred to you as

10  a Camel Jockey?

11     A    I don't presently recall.

12     Q    Do you recall where they referred to you

13  as a Camel Jockey?

14     A    Inside the police station.

15     Q    Do you recall where inside the police

16  station?

17     A    I don't presently recall.

18     Q    Do you recall when any city employee

19  referred to you as Ali Baba?

20     A    Repeat the question, please.

21     Q    Do you recall when any New Rochelle

22  employee referred to you as Ali Baba?

23     A    I don't presently recall.

24     Q    Do you recall where they referred to you

25  as Ali Baba?

17

ARAZ ALALI

1

2      A     I don't presently recall.

3      Q     Do you recall -- withdrawn.

4            Can you identify any city employee

5  who referred to you as Ali?

6      A     Yes.

7      Q     Can you tell me who that was?

8      A     I don't presently recall.

9      Q     And can you tell me when any city employee

10 referred to you as Ali?

11     A     I don't presently recall.

12     Q     Can you tell us where any city employee

13 referred to you as Ali?

14     A     I don't presently recall.

15     Q     Did you make any notation of that incident

16 when some city employee referred to you as Ali?

17     A     I don't presently recall.

18     Q     Now, aside from the terms that are

19 mentioned in subparagraph A, terrorist, Ali Baba,

20 Camel Jockey and Ali, has any city employee referred

21 to you in any term that you considered to be

22 derogatory?

23     A     Yes.

24     Q     Can you tell us what those terms were?

25     A     Bin Laden.  I don't presently recall any

18

ARAZ ALALI

1

2  others.

3      Q    Can you identify what city employee

4  referred to you as Bin Laden?

5      A    I don't presently recall.

6      Q    Do you recall when any city employee

7  referred to you as Bin Laden?

8      A    I don't presently recall.

9      Q    Do you recall where any city employee

10 referred to you as Bin Laden?

11     A    I don't presently recall.

12     Q    Did you make any notation of the fact that

13 some city employee referred to you as Bin Laden?

14     A    I don't presently recall.

15     Q    Is there anything that could refresh your

16 recollection as to when some city employee referred

17 to you as Bin Laden?

18     A    I'm sure there is.

19     Q    Can you tell us what that could be?

20     A    Talking to counsel.

21     Q    Is there anything else other than talking

22 to counsel that would refresh your recollection?

23     A    I don't presently recall.

24     Q    Moving down to -- withdrawn.

25          What is the basis -- withdrawn.

19

ARAZ ALALI

2          Do you believe that Commissioner

3  Carroll was aware of the fact that some city

4  employee referred to you as a terrorist?

5       A    Yes.

6       Q    What is the basis for your belief that he

7  was aware of that?

8       A    Being the police commissioner.

9       Q    Any other reason to believe that he knew

10  that that happened?

11       A    Being the police commissioner.

12       Q    Aside from being the police commissioner,

13  is there any other reason?

14       A    That was it.  Just that.

15       Q    Just the fact that he's the commissioner?

16            You have to say yes or no for the

17  purpose of the record.

18       A    No, not at this time.  I don't believe any

19  other reasons at this time.

20       Q    Do you believe that Commissioner Carroll

21  knew that some city employee referred to you as Ali

22  Baba?

23       A    Yes.

24       Q    What's the basis for your belief that he

25  knew that?

20

ARAZ ALALI

1

2     A     Being the police commissioner.

3     Q     Any other reason?

4     A     I don't believe so.

5     Q     Do you believe that Captain Gazzola was

6 aware of the fact that some city employee referred

7 to you as Ali Baba?

8     A     Yes.

9     Q     What is the basis for your belief?

10     A     Captain on patrol.

11     Q     Any other reason?

12     A     The reasons in this complaint.

13     Q     Let me rephrase it.  Do you have any other

14 reason, other than the fact that Captain Gazzola was

15 the captain, that he was aware that someone referred

16 to you as Ali Baba?

17     A     I believe I addressed that, that he had

18 called me and addressed me as a terrorist.  So yes.

19     Q     No, I understand --

20     A     Ali Baba?

21     Q     Ali Baba.  We're done with the terrorist.

22 We're up to Ali Baba.

23     A     Yes.

24     Q     What's the basis for your belief that he

25 knew that someone called you by the name of Ali

21

ARAZ ALALI

1
2    Baba?

3        A    Captain on patrol.

4        Q    Just by virtue of his position?

5        A    And his direct contact with other

6    supervisors, and he had supervisory control of them.

7        Q    Other than what you've just mentioned, do

8    you have any other reason to believe that he was

9    aware of the fact that somebody referred to you as

10   Ali Baba?

11       A    The reasons I think -- I actually know, in

12   8B, C, D and forward of this complaint.

13       Q    But I need you to explain in your own

14   words what the facts are.  Okay.  So let me -- if my

15   question is unclear, just tell me.  I'm happy to

16   rephrase it.

17            Other than the fact that Captain

18   Gazzola is the captain, is there any other reason to

19   believe that he knew that someone referred to you as

20   Ali Baba?

21       A    Yes.

22       Q    Which is?  If you can explain what that

23   reason is.

24       A    It's clearly spelled out in the complaint

25   from 8B and forward.  From 8A forward.

22

ARAZ ALALI

1

2    Q    Other than what's explained in the

3  complaint, do you have any reason to believe he was

4  aware of that fact?

5    A    I don't believe so.

6    Q    In reference to the term Camel Jockey, is

7  there any reason to believe that the commissioner

8  was aware of the fact that someone referred to you

9  as a Camel Jockey?

10    A    Yes.

11    Q    What is the basis for your belief?

12    A    Being the police commissioner of the

13  department.

14    Q    Is there any other basis for your belief,

15  other than the fact that he is the commissioner?

16    A    I don't believe so.

17    Q    Okay.

18    MR. LOVETT:  Give me one minute, okay.

19    MR. MEISELS:  Sure.

20        (Brief Recess Taken)

21    Q    Okay?

22    A    Okay to what?

23    Q    To proceed?

24    A    Yes.

25    MR. MEISELS:  Can I have my last question

23

ARAZ ALALI

1    read back?

2    read back?

3             (Record Read Back)

4    Q    Do you believe that Captain Gazzola was

5    aware of the fact that some city employee referred

6    to you as the Camel Jockey?

7    A    Yes.

8    Q    What is the basis for your belief that he

9    was aware of that?

10   A    After being served with this complaint --

11   Q    Right.

12   A    -- Captain Gazzola had given a direct

13   order, standing order, to the supervisors under his

14   command to put me inside the civilian radio room,

15   which is primarily performed by civilian personnel.

16   Part of the order also stated that I was to have

17   absolutely no contact with the public, not to even

18   view them in the front area of the police station

19   where they walk in.  But barring me from being on

20   the street, confining me to the positions --

21   humiliating positions such as dispatcher, watching

22   suicidal prisoners, being a jail maiden, and barring

23   me from using any police or departmental vehicles at

24   any time.

25   Q    And is that the basis for your belief that

24

ARAZ ALALI

1    he knew that someone called you a Camel Jockey?

2         A    There are other reasons.

3         Q    Could you explain what they are?

4         A    The chronic below-standard job performance

5    evaluations when my -- the fact is my job

6    performance evaluations are higher than any other

7    member of the service, clearly above standard.  The

8    fabrications within the job performance appraisal,

9    which I addressed in your numerous rebuttal letters.

10              The fact the captain has barred me

11   from working any overtime or doing any mutual

12   switches based on the fabricated below-standard job

13   performance levels.  Forcing me to go to classes

14   such as Tools for Tolerance, post 9/11, which I did

15   not request to go and clearly made it a point to

16   state that I did not want to go but was ordered to

17   go.

18              Repeatedly being put on these false

19   investigations which states that there was

20   wrongdoing when there was absolutely no wrongdoing.

21   Forced to walk foot post in the snow during the

22   midnight tour when there are no foot posts on the

23   midnight tour.

24              Relegated to work the demeaning

25

ARAZ ALALI

1

2  assignments such as issuing parking tickets on a

3  given street and that street, the -- barring me from

4  doing any police station functions.  Just relegated

5  to issue parking tickets in a confined area.

6              After filing the complaint, the EEOC

7  initially, retaliating by then serving me with false

8  charges and specifications, which is calling for a

9  30 day suspension.  There are countless other things

10  that presently do not come to my memory at this time

11  but I'm sure I'll be able at some point to remember

12  others.

13      Q    As you sit here today, can you tell us any

14  other reasons that you believe that Captain Gazzola

15  was aware of the fact that someone called you a

16  Camel Jockey?

17      A    The reasons I just stated to you.

18      Q    Can you think of any others?

19      A    Not at this time.

20      Q    In reference to the term Ali, do you

21  believe that the commissioner was aware that someone

22  referred to you as the name Ali?

23      A    I do.

24      Q    What is the basis for your belief?

25      A    Yes.  The reason being, the commissioner

26

ARAZ ALALI

1

2   being served with this complaint has done absolutely

3   nothing about it.  I have continually been the

4   subject of retaliation.  Being degraded and

5   humiliated.  The commissioner has called me into his

6   office and told me to drop the lawsuit, otherwise it

7   will be a long career for me.  I believe the

8   commissioner committed acts of attempted coercion

9   and official misconduct.

10      Q    Other than what you've just mentioned, do

11   you have any other reason to believe that he was

12   aware of the fact that someone referred to you as

13   Ali?

14      A    Also the numerous departmental

15   communications that I personally addressed to him

16   regarding these bias acts, and he's done nothing

17   about them.

18      Q    In any one of your communications, did you

19   ever tell him you were referred to by the name of

20   Ali?

21      A    I don't presently recall.  I know there

22   was a flurry of communications to him.

23      Q    Other than the things that you just

24   mentioned, do you have any other reason to believe

25   that he was aware of the fact that someone called

27

ARAZ ALALI

1   you the name Ali?

3       A    Not at this time, I don't believe so.

4       Q    Do you believe that Captain Gazzola was

5   aware of the fact that you were referred to by the

6   name Ali?

7       A    Yes.  By all the things I have indicated

8   that Captain Gazzola -- earlier on.  Forcing me

9   to -- giving these calculated below-standard

10  evaluations, forcing me to attend these degrading

11  seminars, which I -- denying me of any meaningful

12  specialized training.  And all of the things I have

13  indicated earlier.

14      Q    Other than what you've already mentioned

15  today, is there any other basis for your belief that

16  he was aware of the fact that someone called you the

17  name Ali?

18      A    I don't believe so.

19      Q    When I say he, I'm referring to Captain

20  Gazzola.  Are we on the same wavelength?

21      A    Yes.

22      Q    Do you believe that the commissioner was

23  aware of the fact that someone referred to you by

24  the name Bin Laden?

25      A    Yes.

28

ARAZ ALALI

1

2    Q    What's the basis for your belief that the

3    commissioner was aware of that?

4    A    Being served with this complaint, he has

5    done nothing about it and these acts have continued

6    to go on.  By him calling me, as I stated earlier,

7    into his office, stating to drop the lawsuit, it

8    would be in my best interest to drop the lawsuit.

9    That he was starting me on a clean slate.  I have

10    expressed to him if that was the case, a clean slate

11    should start now.

12    Q    Other than what you've just mentioned, do

13    you have any other reason to believe that the

14    commissioner was aware of the fact that someone

15    referred to you by the name Bin Laden?

16    A    I don't believe so.

17    Q    Do you believe the Captain Gazzola was

18    aware of the fact that someone referred to you by

19    the name Bin Laden?

20    A    By all the reasons I have stated earlier.

21    Q    Other than what you've already testified

22    to today, do you have any other reasons to

23    believe --

24    A    I don't presently recall.

25    MR. LOVETT:  Let him finish.

29

ARAZ ALALI

1

2      Q    Other than what you've already testified

3  to today, do you have any reason to believe that

4  Captain Gazzola was aware of the fact that someone

5  called you the name Bin Laden?

6      A    I don't presently recall.

7      Q    Now, moving on to -- withdrawn.

8            Did you ever complain in writing to

9  anyone about having been called the name Bin Laden?

10     A    I don't presently recall.

11     Q    Did you ever in writing complain to anyone

12  about having been called a Camel Jockey?

13     A    I don't presently recall.

14     Q    Did you ever complain to anyone in writing

15  about having been called Ali?

16     A    I don't presently recall.

17     Q    Did you ever complain to anyone in writing

18  about having been called Ali Baba?

19     A    I don't presently recall.

20            Let me just add to that that this

21  complaint stated that -- other than this complaint?

22     Q    Yes.  Correct, absolutely.  Other than

23  this complaint.

24     A    I don't presently recall.

25     Q    And other than this complaint, have you

30

**ARAZ ALALI**

1

2    ever complained to anybody about having been called

3    a terrorist, in writing?

4        A    I don't presently recall.

5        Q    Is this the -- is your complaint the first

6    written complaint that you've made about having been

7    called these names?

8        A    I don't presently recall.

9        Q    Moving on to subparagraph B.  Page 3,

10   paragraph A but sub B, okay.  It says, "Repeatedly

11   been denied any meaningful specialized training,

12   which training is routinely provided by defendants

13   to police officers junior to plaintiff in

14   seniority."  Is that correct?

15       A    Yes.

16       Q    Could you explain what specialized

17   training you have not received that you believe you

18   should have received?

19       A    I haven't received any specialized

20   training.

21       Q    When you use the term meaningful

22   specialized training, is that different from

23   specialized training?

24       A    Yes.

25       Q    Could you explain what the difference is?

31

ARAZ ALALI

1

2    A    Meaningful specialized training would be

3  training that would be beneficial to my function as

4  a patrol officer.

5    Q    Have you received any specialized training

6  since you've been a New Rochelle police officer?

7    A    No.

8    Q    Could you explain what you mean by

9  specialized?

10   A    Training such as anticrime school, data

11  master school, radar school, CIU cross-training.

12  Glock armory school.  I'm sure there is other

13  specialized training that I'm leaving out.

14  Interview and interrogation techniques.  To date I

15  have not received any specialized training, although

16  I have asked for it.

17   Q    Have you ever asked for it in writing?

18   A    Yes.

19   Q    And do you recall when you did that?

20   A    I don't presently recall.

21   Q    And to whom did you direct your requests?

22   A    I don't presently recall.

23   Q    Now, referring back to the language of

24  your complaint, indicates, "which training is

25  routinely provided by defendants to police officers

42

1                          ARAZ ALALI

2        A     I don't presently recall.

3        Q     Do you remember how many New Rochelle

4    police officers you saw there?

5        A     No.

6        Q     Do you know whether or not those officers

7    were persons of Middle Eastern descent?

8        A      There was no one else of Middle Eastern

9    descent besides myself there.

10            MR. LOVETT:  Objection as to form.  You

11        said could.

12            MR. MEISELS:  Could?

13            MR. LOVETT:  That was the question.  I'm

14        objecting as to form.

15            MR. MEISELS:  Okay, fair enough.

16        Q     Officer Alali, referring again to

17    subparagraph C, it indicates that you were forced to

18    attend a seminar concerning Tools for Tolerance

19    post-9/11, which assignment was calculated by

20    defendant to humiliate and embarrass the plaintiff.

21                  Could you explain what the basis is

22    for your belief that anyone intended to humiliate

23    and embarrass you by assigning you to go to that

24    seminar?

25        A      That seminar entailed terrorists that were

43

ARAZ ALALI

2  responsible for September 11th.  Being called a

3  terrorist, Ali Baba, Camel Jockey, and then sent to

4  that class was embarrassing and humiliating.  After

5  expressing that I did not want to go.

6      Q    Who did you explain that to, that you did

7  not want to go?

8      A    Captain Gazzola.

9      Q    Did you tell it to anybody else?

10     A    I don't presently recall.

11     Q    Did you put your objection in writing?

12     A    I don't presently recall.

13     Q    Now, is it your belief that the assignment

14  of the other New Rochelle police officers to go to

15  that seminar was also calculated to humiliate and

16  embarrass them?

17     A    I believe there was a few slots to go to

18  this class and I believe the other members of the

19  service that went were just to fill in those few

20  slots.

21     Q    Let me rephrase the question.  Do you

22  believe that these other members of the New Rochelle

23  Police Department were assigned to go to that

24  seminar in an effort to humiliate and embarrass

25  them?

44

ARAZ ALALI

1

2      A    No, they were not of Middle Eastern

3   descent.

4      Q    What is the basis for your belief that

5   those officers were not of Middle Eastern descent?

6      A    Being that I feel I'm the only -- I know

7   I'm the only Middle Eastern police officer in the

8   department.

9      Q    And other than what you've already

10  testified to today, is there any other basis for

11  your belief that you're the only officer of Middle

12  Eastern descent in the police department?

13     A    No.

14     Q    Do you know whether or not there are any

15  Jewish police officers in the police department?

16     A    I don't know.

17     Q    Okay.  Do you believe that Commissioner

18  Carroll calculated to embarrass you by having you

19  assigned to go for that Tools for Tolerance seminar?

20     A    Yes.

21     Q    What is the basis for your belief that he

22  contemplated embarrassing you?

23     A    Firstly, by being the police commissioner.

24  Secondly, by -- I expressly -- I did tell Captain

25  Gazzola that I did not want to attend the seminar.

45

1                    ARAZ ALALI

2    The fact that I was -- all the other facts in this

3    complaint that he was aware of.

4        Q    Do you believe that Captain Gazzola

5    calculated to humiliate and embarrass you by sending

6    you to the seminar?

7        A    Yes.

8        Q    What is the basis for your belief that he

9    intended to embarrass and humiliate you?

10       A    What I stated earlier, by calling me those

11   derogatory names, as well as upon me telling him

12   that I did not want to go, he ordered me to go.

13       Q    Now, do you recall whether you attended

14   this seminar in the year 2001?

15       A    I joined the police department in 2002.

16       Q    That's correct.  Withdrawn.

17            Do you recall whether you attended

18   the seminar in 2002?

19       A    I don't presently recall.

20       Q    Do you recall what year you attended the

21   seminar?

22       A    I don't presently recall.

23       Q    Had you been called the name terrorist

24   before you were assigned to go to the seminar?

25       A    I don't presently recall.

46

ARAZ ALALI

1

2      Q     Had you been called the name Ali Baba

3  before you were assigned to go to the seminar?

4      A     I don't presently recall.

5      Q     Had you been called the name Camel Jockey

6  before you were assigned to go to the seminar?

7      A     I don't presently recall.

8      Q     Had you been called the name Ali before

9  you were assigned to go to the seminar?

10      A     I don't presently recall.

11      Q     Okay.  Had you been called the name Bin

12  Laden before you were assigned to go to the seminar?

13      A     I don't presently recall.

14      Q     Aside from those derogatory terms that

15  we've just mentioned, had you been the victim of any

16  other forms of intolerance before you were assigned

17  to go to the seminar?

18      A     I don't know the date that I went to the

19  seminar so I can't accurately answer that question.

20      Q     Okay.  Aside from the commissioner and

21  aside from Captain Gazzola, are you aware of any

22  other city employee who intended to humiliate or

23  embarrass you by having you assigned to go to that

24  seminar?

25      A     I don't believe so.

47

ARAZ ALALI

1

2      Q     Okay.  Referring to the next subparagraph,

3  D, it says, "Systematically been given calculatedly

4  false below-standard job performance evaluations."

5              As you sit here today, who do you

6  understand calculated to give you those

7  below-standard job performance evaluations?

8      A     Captain Gazzola.

9      Q     Anybody else?

10     A     I don't believe so.

11     Q     Okay.  And reading on in your complaint

12  where it says, "When in fact his job performance has

13  consistently been above average."

14              Could you explain what the basis is

15  for your belief that your performance has been

16  consistently above average?

17     A     Yes.  A performance evaluation that was

18  recently conducted by Sergeant Kyle Wilson stated

19  that since I have entered the New Rochelle Police

20  Department in 2002, I have been consistently the

21  top-producing police officer.

22              There are goals/objectives that are

23  set forth by the department.  Those goals and

24  objectives are 120 moving violations per year that

25  consist of ten moving violations per month and 25

48

ARAZ ALALI

1     parkers a month.  I don't know what that totals out

2     to.

3             But since I have been there, since

4     2002, I have well exceeded that.  Other officers who

5     have not even come close to that, not even met the

6     goals or objectives, have been given standard

7     performance evaluations.

8             As far as also arrests, I work the

9     second tour, which is eight to four.  I have the

10    highest arrest on that tour since I have been there,

11    every year.  Just to give you an example, between

12    March and May 31st, I have exceeded the 120 that is

13    given as an annual objective.  Also during that

14    period I have had 19 arrests.  However, I have been

15    given a below-standard evaluation by Sergeant Brady.

16    Other members of the service that clearly do not

17    have those performance levels are given either

18    above-standard or standard performance evaluations.

19            And that also serves as them barring

20    me from doing any overtime, which substantially

21    impaired my income.  And also barring me from doing

22    mutual switches, which again is a great

23    inconvenience since I care for a two-and-a-half-

24    year-old child.

49

ARAZ ALALI

1

2          That letter also was generated by

3    Captain Gazzola himself, stating that I was barred

4    from doing overtime assignments and also barred from

5    doing mutual switches.

6      Q    As far as you know, is there any

7    acceptable number of civilian complaints that a

8    police officer is allowed to receive?

9      A    Civilian complaints fall into different

10   categories of substantiated, unsubstantiated,

11   exonerated.  There is no number set forth by the

12   department as I stated with the other numbers, such

13   as parking violations is 25 per month, 10 moving

14   violations per month.  There is no number.  I have

15   received complaints.  Almost every one of them has

16   been unsubstantiated.

17     Q    Does the term -- is the term

18   unsubstantiated synonymous with unfounded?

19     A    I believe so.

20     Q    Do you have any understanding as to how

21   you compare with other police officers in terms of

22   the number of civilian complaints that have been

23   received?

24     A    No.  But I do know how I fare with the

25   other officers as far as arrests and summonses.

50

**ARAZ ALALI**

1   Clearly above.  I lead the tour every year that I

2   have been a member of the service with the New

3   Rochelle Police Department, since 2002, as indicated

4   by Sergeant Wilson's evaluation, as indicated by the

5   rebuttal letters.

6   Q    And is Sergeant Wilson's evaluation the

7   basis for your belief that you led the other

8   officers?

9   A    No.  On top of the -- there is a system

10  you can get into which shows -- computer-based

11  system that shows the numbers for each officer,

12  which is inputted by a civilian member of the

13  service, and it's spelled out in black and white.

14  The sergeant would use that to transpose that onto

15  the performance evaluations.

16  Q    Does that system indicate to you where you

17  stand in comparison to other police officers?

18  A    The numbers show I have ten summonses and

19  you one, clearly I would have more summonses than

20  you.

21  Q    Are you able to see what other police

22  officers have done by accessing that system?

23  A    Yes.

24  Q    Okay.  Have you done that?

51

ARAZ ALALI

1

2      A     Yes.

3      Q     Going back to subparagraph D of

4    paragraph 8 of your complaint where it indicates,

5    "use of language replete with fabrications and

6    falsehoods."

7               As you sit here today, what

8    fabrications or falsehoods were included in your job

9    evaluation?

10     A     Many.  I don't have the narrative in front

11   of me of those performance evaluations, but by the

12   mere fact that they were clearly rated falsely as

13   below standard and not above standard is the crux of

14   why it's completely fabricated.  I would have the

15   exact narrative in front of me to point out each and

16   every one of the fabrications, but the overall

17   evaluation being served as below standard is clearly

18   false.

19     Q     And is the basis for your opinion that

20   those evaluations were false that your numbers are

21   significantly higher than the other officers?

22     A     I don't think it's opinion.  I think it's

23   factual.  I think numbers are factual.  Again, I

24   think if you use number one, one is less than -- two

25   is greater than one.  I don't think there is any

52

ARAZ ALALI

1  opinionation [sic] in performance numbers, arrest

2  numbers.  No matter what angle you look at these

3  numbers, they are black and white.  Stand on its own

4  merit.

5  merit.

6      Q    Is the basis for your belief that these

7  evaluations were false the fact that your numbers

8  were higher than other police officers?

9      A    I don't believe.  Let me make that clear.

10 I don't believe them to be false, I know them to be

11 false.  It's not opinionated.  It's not a belief.

12 It's not mythical.  It's factually false.

13     Q    Is it your understanding that they're

14 false based upon your numbers being higher than

15 other police officers?

16     A    My understanding they're false for

17 numerous reasons, by sergeants themselves telling me

18 Captain Gazzola has ordered them to make them below

19 standards, and they apologize.  They're false for,

20 as I have indicated, I have had the highest

21 performance levels in all the areas of a patrol

22 officer.

23     Q    Can you identify the persons who told you

24 that Captain Gazzola ordered them to classify you as

25 below standards?

61

ARAZ ALALI

1

2    better way to put it, yes.

3        Q    Okay.  Did anyone ever give you a

4    justification, whether you agreed or disagreed with

5    it, as to why you were assigned to be a dispatcher?

6        A    Yes.  During this whole process I had PBA

7    president Edward Hayes with me.  We spoke to

8    Lieutenant Fortunato with the internal affairs

9    division and he stated that the reason I was inside

10   was because Commissioner Carroll had told myself and

11   Edward Hayes that there was an investigation going

12   on of wrongdoing on my part.

13               When we spoke to Lieutenant

14   Fortunato, he said, I don't know of any order that

15   was given, so I was given two sides of the story.

16   And then when we went back to Commissioner Carroll,

17   he said that there was an investigation going on and

18   that's why you're inside.  Fortunato, although he

19   was investigating it, he said he didn't know if that

20   was the reason I was inside.

21               And present during this whole thing,

22   every time I spoke to Lieutenant Fortunato and

23   Commissioner Carroll, was Edward Hayes.

24       Q    So am I correct that you were told that

25   the justification for being assigned to be a

62

ARAZ ALALI

1

2    dispatcher was that there was an internal affairs

3    investigation, is that correct?

4        A    By Captain Gazzola himself in front of

5    Edward Hayes, yes.  We spoke with Captain Gazzola

6    personally on this issue.

7        Q    And the person who told you that there was

8    a pending investigation was Captain Gazzola?

9        A    And Commissioner Carroll.

10       Q    And did you ever learn what complaint was

11   being investigated?

12       A    Yes.

13       Q    What was it?

14       A    Complaint from a FedEx driver that I had

15   arrested.

16       Q    What is the name of that person?

17       A    I don't presently recall.

18       Q    Prior to arresting that FedEx driver, had

19   you had any prior dealings with him?

20       A    Yes.  Captain Gazzola and Lieutenant

21   Marshall had called me in their office stating he

22   had made a complaint regarding making an illegal

23   u-turn.  They stated -- they forced -- Captain

24   Gazzola forced me to work a car with a camera in it,

25   against my will.  I didn't want to work in a car

65

1                          ARAZ ALALI

2    unlicensed operator.  Resisting arrest.  Failing to

3    comply to a police officer.  And that he had

4    committed numerous traffic violations, which one of

5    them being a red light.  I don't recall the other

6    violations.  Numerous traffic violations that he was

7    given citations for as well.

8         Q    Now, you say you arrested him for

9    resisting arrest, correct?

10        A    No.

11        Q    That was one of the -- no, you didn't?

12        A    You asked me what the charges were.

13        Q    Correct.

14        A    I said that was one of the charges.  That

15   was not what I arrested him for.

16        Q    What did you arrest him for?

17        A    Unlicensed operator.  He refused to give

18   me his license.  He had no form of I.D. on him that

19   he would give me.  That summons was limited.  That

20   came subsequent to resisting arrest.

21        Q    Other than the time that you gave him the

22   ticket for making a u-turn and the time that you

23   arrested him, did you have any other contact with

24   this FedEx driver?

25        A    I don't presently recall.  I was assigned

66

ARAZ ALALI

1   to give parking tickets on a stretch of North

2   Avenue.   There's many deliveries being made on North

3   Avenue.   And I had very high numbers for parking

4   summons.

5

6              So I don't know if I had summons to

7   him personally, delivered a summons upon him, no.

8       Q    Did you have a dispute with him about his

9   delivery of a package to your house?

10      A    Yes.

11      Q    When was that?

12      A    I don't presently recall.

13      Q    You recognized him at the time that you

14  arrested him as a person you had a dispute with?

15      A    Not initially.

16      Q    At what point did you recognize him?

17      A    After the incident.

18              (Brief Recess Taken)

19      Q    Officer Alali, let's refer back to Page 3

20  of your complaint and subparagraph D, is it your

21  contention that as a result of receiving below

22  standard job evaluations that you've suffered

23  pecuniary loss?

24      A    Yes.

25      Q    Can you estimate what that loss has been?

70

ARAZ ALALI

1
2    the past two years, very, very few.  I can count

3    probably on one hand how many hours I have had.  A

4    few.

5        Q    And were there any years in which you

6    received anything more than a below-standard

7    evaluation since you've been a New Rochelle police

8    officer?

9        A    I don't understand the question.  I don't

10   believe there's a category substandard.  Anything

11   more than below standard?

12       Q    No, higher than?

13       A    Higher than, yes.

14       Q    What was your evaluation for the year

15   2002?

16       A    I don't presently recall.

17       Q    Was it below standard?

18       A    No.

19       Q    What was your evaluation for 2003?

20       A    I don't presently recall.

21       Q    Was it below standard?

22       A    No.

23       Q    What was your evaluation for the year

24   2004?

25       A    I don't presently recall.

71

ARAZ ALALI

1

2    Q    Was it below standard?

3    A    No.

4    Q    And what was your evaluation for 2005?

5    A    I don't presently recall.

6    Q    Was that below standard?

7    A    Could have been.

8    Q    All right.  Now, let's go back to the

9 first three years that you were employed as a New

10 Rochelle police officer:  2002, 2003, 2004.  During

11 those three years, as far as you know, did anyone in

12 the New Rochelle Police Department know that you

13 were of Middle Eastern descent?

14    A    I believe so.

15    Q    And am I correct that for the years 2002,

16 2003 and 2004, you did not receive below-standard

17 evaluations?

18    A    Yes.

19    Q    Let me go back to subparagraph D.

20    A    On Page 4?

21    Q    Yes.  Page 3.  Sorry.  The bottom of

22 Page 3.  Got it?

23    A    I got it.

24    Q    Okay.  You had explained to me the

25 distinction between departmental overtime and

77

ARAZ ALALI

1

2   dispatcher.  I don't know exactly when.

3       Q    Can you estimate how -- withdrawn.

4            Can you estimate on how many

5   occasions each year a police officer is assigned to

6   work as a dispatcher?

7       A    How many times a year?

8       Q    Each year does that happen?

9       A    I would have no idea.  All I know is that

10  it is a civilian function and I don't remember any

11  police officer doing it for an extensive period of

12  time such as half a year.

13      Q    Am I correct that you do recall that other

14  police officers have been assigned for some period

15  of time to do that?

16      A    Some very short periods of time.

17      Q    What's the longest period of time that you

18  can recall any police officer assigned to be a

19  dispatcher?

20      A    I would say -- I don't know who, but when

21  a police officer is injured, for the period of time

22  they're injured or impaired, that would probably be

23  a longer period of time than when a civilian member

24  calls in sick.

25      Q    Let's take a look at subparagraph E where

78

ARAZ ALALI

1

2   it indicates, "Forced to work walking posts during a

3   midnight to 8:00 a.m. tour of duty."

4               When were you assigned to a walking

5   post on the 8:00 a.m. -- on the midnight to

6   8:00 a.m. tour?

7       A    Again, when I was assigned to the midnight

8   tour, I don't presently recall the year.  However, I

9   was assigned for months on that tour to walk a foot

10  post.

11      Q    Where was that foot post?

12      A    Wherever they deemed it to be that night.

13      Q    So would that foot post change from day to

14  day?

15      A    I don't know about day to day, but it was

16  different areas that I was walking.  I don't know if

17  it was day to day or week to week.

18      Q    But the location was variable?

19      A    Yes, basically variable, yeah.  I remember

20  one time that it was on Union Avenue on the corner

21  when it was snowing out.  That's an area that's not

22  heavily populated at night.  It's not on the police

23  post.  There are some foot posts for the day tours,

24  not on the midnights.  But that's not in the police

25  post book at all.  Kind of an off the track area.

79

ARAZ ALALI

1

2          I was told to stand on the corner of

3   Union Avenue while it was snowing out and not to

4   move from the corner.  For no purpose.

5          Q    Who ordered you to do that?

6          A    That was Sergeant Jones and Sergeant

7   Gianatti.

8          Q    And when did that occur?

9          A    I don't have the dates, but when I was

10  assigned to the midnight tour.

11         Q    What years were you assigned to the

12  midnight tour?

13         A    I don't presently recall.  It was early on

14  in my career.

15         Q    Were you assigned to the midnight tour

16  during the years that you received standard

17  evaluations?

18         A    I don't presently recall.

19         Q    How long did you work the midnight tour?

20         A    I don't presently recall, but I know the

21  incident that changed me.  Walking the midnight tour

22  was the complaint -- supervisor complaint generated

23  by Sergeant Jones, which is a false complaint,

24  stating that I did not give him the reason for a car

25  stop.  And then the second part of that complaint

89

ARAZ ALALI

1    the midnight tour?

3    A    Right.

4    Q    Can you estimate how long it's been since

5    you've been on the midnight tour?

6    A    It would be bad guess.

7        MR. LOVETT:  Don't guess.

8    A    I don't know.

9    Q    Let's go on to subparagraph F.  Indicates,

10   "Forbidden for substantial periods of time to

11   operate a police vehicle."

12        Does that relate to the circumstance

13   you've already testified to about the civilian

14   complaint from the FedEx driver, or does it relate

15   to something else?

16   A    That is -- for approximately the six month

17   period of time that I stated earlier.

18   Q    Okay.  Is that the same period of time

19   that you were assigned to be a dispatcher?

20   A    Yes.

21   Q    Does that relate to the civilian complaint

22   that was filed by the FedEx driver?

23   A    It depends what side of the story you get.

24   If you get it from Fortunato or you get it from

25   Commissioner Carroll.  Conflicting stories on that.

90

1                              ARAZ ALALI

2        Q    Let's start with Commissioner Carroll.

3    What did he tell you?

4        A    Stated it is because of a departmental

5    investigation.

6        Q    And what did Lieutenant Fortunato tell

7    you?

8        A    He did not have knowledge that it was

9    because of a departmental investigation.

10       Q    And did Commissioner Carroll tell you

11   anything about it, other than what you already

12   testified to?

13       A    No.  Captain Gazzola also stated it was

14   because of the departmental investigation.

15       Q    And did Captain Gazzola tell you anything

16   else about it, other than what you just testified

17   to?

18       A    Well, besides issuing a standing order of

19   performing functions that are listed in this

20   complaint.

21       Q    Did Lieutenant Fortunato tell you

22   anything, other than what you've already testified

23   to, about this -- about your being barred from

24   operating a police vehicle?

25       A    No.

96

ARAZ ALALI

1

2      Q     Did you ever communicate with members of

3   the public while you were dispatcher?

4      A     No, I was barred from answering the phone.

5      Q     Aside from the time that you were assigned

6   to be a dispatcher, have you ever been barred from

7   interacting with members of the public while you

8   were on duty?

9      A     I don't presently recall.

10      Q     Let's move down to subparagraph I where it

11   says, "Subjected repeatedly to investigations of

12   supposed wrongdoing under circumstances where no

13   wrongdoing occurred and defendant knew that no

14   wrongdoing had occurred."  Do you see that?

15      A     Yes.

16      Q     Could you explain what investigations

17   you're referencing in that paragraph?

18      A     There were many.  The most recent

19   investigation was when I was put in the radio room

20   as a civilian, reduced to a civilian dispatcher, of

21   the wrongful arrest on the FedEx driver, when in

22   fact the captain, police commissioner, knew that

23   there was absolutely no violation of the law on my

24   part.  The defendant violated the law.  I had

25   absolutely done nothing wrong.

97

1          ARAZ ALALI

2                However, they investigated that for

3     over six months.  Like I stated to you, Lieutenant

4     Fortunato stated that the complaint of the FedEx

5     driver had no merit and it was unfounded.

6                The other instance I gave you was of

7     Sergeant Jones of what I stated earlier about not

8     calling out a traffic stop and not handing in a

9     reason of why I conducted a traffic stop.  Captain

10    knew of that incident and took back the complaint.

11               And I remember when I asked the

12    Captain if I had -- there was an out-and-out lie,

13    that if Sergeant Jones had perjured himself and put

14    it on paper, what would be the consequences.  He

15    didn't answer.  I stated what happened if I had

16    perjured myself.  Kind of smiled at that, didn't

17    give an answer.

18               There was other investigations but

19    these are the investigations that we're talking

20    about right now.

21         Q    You mentioned the investigation relating

22    to the FedEx driver and you mentioned the one

23    concerning Sergeant Jones' allegations about failure

24    to call out a stop.

25         A    And failure to hand him the reason for the

ARAZ ALALI

1

2        A    Eight to four.

3        Q    And is it your recollection that after you

4    made that arrest you were assigned to a walking

5    post, but on the eight to four tour of duty?

6        A    I believe so.

7        Q    Were you assigned to a walking post on the

8    eight to four tour of duty before you made the

9    arrest?

10       A    Yes, as a junior officer during the

11   holiday period.  Other times of the year, if I was a

12   junior officer I would walk along with the other

13   junior officers.

14       Q    And are foot posts common on the eight to

15   four tour of duty?

16       A    At times.

17       Q    Are foot posts customary on the eight to

18   four tour of duty?

19       A    If there are enough manpower, I believe

20   so.

21       Q    Other than the incidents you just

22   mentioned of the FedEx driver, the incident with

23   Sergeant Jones, the verbal reprimand from Lieutenant

24   Fortunato and the criminal possession of a forged

25   instrument arrest involving Lieutenant Shulman, can

1        **ARAZ ALALI**

2    you think of any other investigations that you were

3    subjected to concerning matters where the defendants

4    in this case knew that you had done nothing wrong?

5        A    Yes.    Investigation conducted by Captain

6    Gazzola where he stated that on the assignment that

7    I was given at North Avenue detail, that I was

8    writing summonses off post, off the area.  The area

9    had been changed and modified from time to time.

10   The type of summonses that were being dispensed were

11   also modified at Captain Gazzola's discretion from

12   time to time.

13           Another investigation by Captain

14   Gazzola regarding the use of a camera that was put

15   into the car against my will, and notified him and

16   made him aware that the camera in a roll call with

17   other police officers present where he was asking

18   for feedback on the particular type of camera, which

19   is a Coband camera, and I told him that it logs off

20   frequently and doesn't work.  I also gave him a

21   written memo on that as well as going in there with

22   Edward Hayes on at least two occasions, telling him

23   in his office the camera logs off.

24           They sent the camera out to repair,

25   police repair in Mamaroneck.  Came back, it was

1                          ARAZ ALALI

2    still defective.  However, I was written up for not

3    using the in-car camera after they knew that the

4    camera was defective.

5                    After being notified both verbally,

6    numerous times verbally, with other police officers

7    present, myself and Edward Hayes, and also with

8    written correspondence indicating that.

9         Q    Now, in reference to the contention that

10   you were writing summonses in areas that were off

11   your assigned post, is that the subject of the

12   pending disciplinary hearing or is it a different

13   matter?

14        A    No, it is.

15        Q    It is.  Okay.  And in reference to the

16   alleged failure to use a camera, is that the subject

17   of a pending disciplinary hearing?

18        A    Yes.

19        Q    Now, are there any other instances where

20   you believe you were investigated by -- for doing

21   things that the defendants knew you had not done

22   wrong?

23        A    Yes.  The New Rochelle High School

24   crossing, the assignment that you cross at times is

25   referred to as crossing, at times referred to as

119

2    C E R T I F I C A T I O N

3

4         I, SUSIE CABANAS-DIAZ, a Court Reporter

5    and Notary Public within and for the State

6    of New York, do hereby certify:

7         That the witness whose deposition

8    is herein before set forth, was duly sworn

9    by me, and that the within transcript is a

10   true record of the testimony given by such

11   witness.

12        I further certify that I am not

13   related to any of the parties to this action

14   by blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto

17   set my hand this *2nd* day of *July* , 2007.

18

19

20   _____

21        SUSIE CABANAS-DIAZ

22

23

24

25

ORIGINAL

121

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - - - - - - -x

    ARAZ ALALI,

4

                        Plaintiff,

5

                 -against-        INDEX NO.

6                                 07 CIV 1296

7   ROBERT GAZZOLA, individually, PATRICK J. CARROLL,

    individually, and THE CITY OF NEW ROCHELLE, New York,

8

                        Defendants.

9   - - - - - - - - - - - - - - - - - - - - - - -x

10

11                      July 10, 2007

                        12:00 p.m.

12

13        CONTINUED EXAMINATION BEFORE TRIAL of

14  Plaintiff, ARAZ ALALI, taken pursuant to Notice, held

15  at the offices of Wilson, Elser 3 Gannett Drive,

16  White Plains, New York, before a Notary Public within

17  and for the State of New York.

18

19

20

21

22                   *   *   *

23

24

25

Page 122

```
 1
 2     A P P E A R A N C E S:
 3
               LOVETT AND GOULD, LLP
 4             Attorneys for Plaintiff
               222 Bloomingdale Road
 5             White Plains, NY  10605
 6             BY:  JONATHAN LOVETT (4854), ESQ.
 7
               WILSON ELSER
 8             Attorneys for Defendant
               3 Gannett Drive
 9             White Plains, NY  10604
10             BY:  PETER MEISELS, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

1

2      IT IS HEREBY STIPULATED AND AGREED by and between

3    counsel for the respective parties herein:

4            All rights provided by the C.P.L.R., and

5    Part 221 of the Uniform Rules for the Conduct of

6    Depositions, including the right to object to any

7    question, except as to form, or to move to strike any

8    testimony at this examination is reserved; and in

9    addition, the failure to object to any question or to

10   move to strike any testimony at this examination

11   shall not be a bar or waiver to make such motion at,

12   and is reserved to, the trial of this action.

13           This deposition may be sworn to by the

14   witness being examined herein before a Notary Public

15   other than the Notary Public before whom this

16   examination was begun, but failure to do so or to

17   return the original of this deposition to counsel,

18   shall not be deemed a waiver of the rights provided

19   by Rules 3116 and 3117 of the C.P.L.R., and shall be

20   controlled thereby; and

21           The filing of the original deposition are

22   waived.

23

24

25

1                       ARAZ ALALI

2     law, I was reduced to writing maybe one type of

3     violation and ignoring all other violations.

4          Q      And what kinds of moving violations --

5          A      And also primarily was just to be

6     issuing parking tickets, not moving violations.

7     That's what they explained to me.

8          Q      Did you issue summonses for moving

9     violations when you had this assignment?

10         A      Absolutely.  When there was a

11    violations in my presence, I did do such.

12         Q      You mentioned that you were using a

13    camera car, could you explain what you meant by that?

14         A      It was, prior to being put on this

15    assignment, Captain Gazzola had designated one of the

16    cars that was not used for patrol and had it fitted

17    with a camera, with live audio and also a camera that

18    would record a minute before any type of enforcement.

19                I clearly stated to them that I was the

20    only member of patrol at the time using such a car,

21    actually I was not even in patrol, I was reduced, as

22    I said to you, to issuing parking tickets.  I told

23    them I felt very uncomfortable being in that type of

24    car and I had to be on camera at all times.

25                It was definitely the idea of Captain

1                          ARAZ ALALI

2     Gazzola.  He had went to great lengths to get this

3     car, which was car number 18, fitted just for my

4     purposes only.

5          Q     Am I correct that the stated purpose of

6     the assignment was to improve the flow of traffic on

7     North Avenue?

8          A     That's what was relayed to me, but I

9     clearly know it was to humiliate and degrade me.

10         Q     What was your understanding as to how

11    the issuance of parking tickets would improve the

12    flow of traffic?

13         A     North Avenue is, you know, is congested

14    due to construction, due to the fact that the streets

15    are narrow.  There's not much parking.

16               I don't believe that any of the

17    summonses that I had issued, that I was ordered to

18    issue, did improve the traffic flow on North Avenue.

19               There's traffic, as we speak, now on

20    North Avenue.  There continues to be traffic on North

21    Avenue.  It's just that it is structural.

22               It's not like the streets in White

23    Plains, where there's wide streets.  They're very

24    narrow, so I don't believe my assignment enhanced the

25    flow of traffic on North Avenue.

1                   ARAZ ALALI

2          Q      Was part of your assignment to issue

3   tickets for double parking?

4          A      At one point they said that to issue

5   tickets that would increase the flow of traffic and

6   at a later time they narrowed that down as well as to

7   specific type of parking ticket to the issue, such as

8   double parking tickets.

9          Q      Would the elimination of double parking

10  have an impact on the flow of traffic?

11         A      It could.  I believe it could.

12         Q      On how many occasions did you discuss

13  this assignment with the commissioner before you

14  actually undertook the assignment?

15         A      I don't presently recall.

16         Q      Did the commissioner ask you if you

17  would be interested in having the assignment?

18         A      Actually, I was told that I would have

19  the assignment.

20         Q      Can you tell me, in words or substance,

21  what the commissioner said to you when you were

22  informed about the assignment?

23         A      I don't recall the words or substance

24  presently at this time.  I was just told that I would

25  be in a camera car for the purposes of traffic flow

```
 1                        ARAZ ALALI
 2    issuing parking tickets.
 3         Q      Do you recall if you discussed this
 4    with the commissioner more than once before starting
 5    the assignment?
 6         A      I don't presently recall.
 7         Q      I'd like to move down to Paragraph 9,
 8    Subparagraph A.  Do you see where it says, on
 9    January 7, 2007, advised Carroll that he was the
10    subject of persecution based on heritage?
11         A      Yes.
12         Q      Did you actually have that conversation
13    with the commissioner?
14         A      Yes and also memos regarding exactly
15    what was stated in 9 A.
16         Q      Did you meet with the commissioner on
17    January 7th?
18         A      I don't presently recall.
19         Q      Did you send him a memo on January 7th?
20         A      I don't presently recall.
21         Q      Did you meet with the commissioner on
22    or about January 7th?
23         A      I had met with the commissioner to
24    expressly tell them that I'm being persecuted, solely
25    based upon my heritage, as well as memos.  I don't
```

ARAZ ALALI

1

2       A       Yes.

3       Q       Is that a photocopy of your signature?

4       A       Yes.

5       Q       This does appear to be an application

6    that you filled out for employment with the City of

7    New Rochelle Police Department?

8       A       I believe so.

9       Q       I'm going to show you what's been

10   pre-marked as Defendants' JJ for identification and

11   ask you if you can identify that document?

12      A       Yes.

13      Q       What is it?

14      A       A letter from Commissioner Carroll

15   stating that I have been selected for employment by

16   New Rochelle Police Department.

17      Q       I'm going to show you what's been

18   pre-marked as Defendants' KK for identification and

19   ask you if you can identify that document?

20      A       It's a letter from Commissioner

21   Carroll, stating that -- my acceptance to the New

22   Rochelle Police Department.

23      Q       I'm going to go show you what's been

24   pre-marked as Defendants' LL for identification and

25   ask you if you can identify that document?

Page 240

```
 1                        ARAZ ALALI
 2    you required to review the administrative manual of
 3    the New Rochelle Police Department?
 4         A      I believe so.
 5         Q      And have you done that?
 6         A      From time to time.
 7         Q      I'm going to show you what's been
 8    pre-marked as Defendants' RR for identification and
 9    ask you whether you recognize that document as
10    representing portions of the administrative manual?
11         A      Yes.
12         Q      To the best of your knowledge, does
13    this document represents portion of the
14    administrative manual?
15         A      Yes.
16         Q      Specifically, referring to Paragraph
17    13, have you ever had occasion to review these
18    sections that relate to the criteria that go into
19    performance evaluations?
20         A      Yes.
21         Q      Based upon your review of the criteria,
22    was it your understanding that the evaluations
23    include both qualitative as well as quantitative
24    performance?
25         A      Yes.
```

263

1

2                          C E R T I F I C A T E

3     STATE OF NEW YORK        )

                               :  SS:

4     COUNTY OF ROCKLAND       )

5

6         I, ESTHER KATZ, a Shorthand Reporter and Notary

7     Public within and for the State of New York, do

8     hereby certify:

9         THAT ARAZ ALALI, the witness whose testimony is

10    hereinbefore set forth, was duly sworn by me; and

11        THAT the within transcript is a true record of

12    the testimony given by said witness.

13        I further certify that I am not related, either

14    by blood or marriage, to any of the parties to this

15    action; and

16        THAT I am in no way interested in the outcome of

17    this matter.

18    Dated:  July 30, 2007

19

20                    *Esther Katz*

21                    ESTHER KATZ

22

23

24

25

**Command Discipline Report**
**New Rochelle Police Department**

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD/ 3rd Tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

**Summary of Investigation and Disposition of Complaint:**

On 1 Aug 02 at 1724hrs. P.O. Araz Alali was operating RC #2 on Drake Ave. responding, code 3, to a call for service. P.O. Alali entered Nautilus Pl., traveling the wrong way on the one way street in order to make a u-turn and while doing so became involved in an M.V.A. with another vehicle.

By his actions, P.O. Alali violated section 8.2 of this Departments Rules & Regulations.

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Letter of Reprimand |

Signature of Division Commander                     Date

*Cpt ~~~~ CAPT ROBERT GAZZOLA*          20 Sep 02

**To Be Completed By Officer Charged:**

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( ✓ ) **Accept** the finding and the proposed disciplinary action.

( ) **Decline to** accept any disciplinary action without a statutory hearing.

*P.O.* ~~~~          20 SEPT 02

Officer's Signature              Date              Witnessed by:

                                                   *Cpt ~~~~*

CO 1A


DEFENDANT'S EXHIBIT DD

City Of New Rochelle
New York

Interdepartmental communication

To: P.O. Araz Alali

From: Captain Robert Gazzola

Subject: Letter of Reprimand

Date: 20 Sept. 02

This letter of Reprimand is issued in connection with Command Discipline Number 56/02, which was served upon you on  _20 Sep 02_  and accepted by you on _20 Sep 02_.

You are hereby formally reprimanded for the conduct stated in the above referenced Command Discipline. Failing to operate a department vehicle in a careful and prudent manner and in a manner as to avoid injuries to persons and damage to property interferes with the efficient and orderly operation of the Police Department and demonstrates a lack of professionalism.

You are hereby advised that any further misconduct on your part including, but not limited to, the conduct described above, will result in the imposition of discipline as provided for in Chapter 6 of the New Rochelle Police Departments Manual of Procedure, and may lead to your discharge from employment.

cc: P.O. Joseph Poggioli, P.B.A. President
       Disciplinary file

**New Rochelle Police Department**
**Rules and Regulations**

| Chapter: | Eight | | Date Effective: | 01 Jan 97 |
|---|---|---|---|---|
| Subject: | **Use of Department Vehicles** | Page 1 of 2 | Date Revised: | 10 Jan 02 |

8.1.    Members of the Department will be held responsible for the proper maintenance of assigned department vehicles. (Proper maintenance includes, but is not limited to, checking the vehicle's oil level at the start of each tour of duty or at any time when a member accepts assignment of another vehicle.) Vehicles will be kept clean and free from damage. Equipment assigned to the vehicle will be kept clean and in working condition.

8.2.    Members of the Department will operate department vehicles in a careful and prudent manner in accordance with all Vehicle and Traffic laws and department procedures. Members of the Department will, at all times, give the highest priority to the safety and welfare of the general public when operating a department vehicle and will operate all vehicles in such a manner as to avoid injuries to persons or damage to property.

8.3.    The use of a department vehicle as an emergency vehicle is only permitted in situations where the operator of the vehicle is responding to an actual emergency.

8.4.    A member of the Department will inspect a vehicle and its equipment for damage prior to taking custody of the vehicle. If any unreported damage to the vehicle is discovered or equipment is found missing, the member will immediately advise his supervisor. The vehicle will not be put into use until the supervisor has inspected the vehicle and initiated an investigation to ascertain the origin of the damage or the location of the missing property.

8.5.    Supervisory personnel assigned to investigate accidents involving department vehicles, incidents involving unreported damage to department vehicles or incidents involving equipment missing from vehicles will submit their findings and recommendations in a PD 37 to their Division Commander. This report will be completed prior to the conclusion of the supervisor's tour of duty.

8.6.    A member of the Department will, upon discovering any mechanical defect or problem with a department vehicle, file a D.P.W. 9 and advise his immediate supervisor of the vehicle's condition and need for repair.

8.7.    No member of the Department will utilize any vehicle other than a department vehicle in the performance of an official duty assignment. (Exceptions to this rule are court appearances, schools, seminars, Special Detail assignments, and any other situation specified by the Police Commissioner or his designee. All exceptions must have prior approval.)

8.8.    Members of the Department are prohibited from leaving the City of New Rochelle in police vehicles unless on official business. Members will notify the Desk Officer or police dispatcher when leaving the city and upon returning to the city. This information will be entered in the PD 29.

8.9.    Members of the Department will not double park department vehicles unless doing so is incidental to the performance of official police duty and no other reasonable alternative exists.

8.10.    Department vehicles will not be used to push, tow, or jump-start other vehicles except in extreme emergency situations.

**Command Discipline Report**
**New Rochelle Police Department**

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD/ 1st tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

**Summary of Investigation and Disposition of Complaint:**

On 29 Oct 02 at 0130hrs, P.O. Araz Alali was detailed to Pelham Rd. & Pelhamdale Ave. to provide an escort for a large piece of equipment being transported by Con Edison. At 0205hrs P.O. Alali contact CSO Schena in the radio room and advised that Con Edison had not appeared as yet. Sgt. Giannotti advised Alali, through Schena, to remain at the location until 0230hrs. At 0215hrs. Sgt. Giannotti observed Alali entering the front door at the Mirage Diner at 690 North Ave.. An investigation by Sgt. Giannotti revealed that Alali had not requested, nor had he been granted, permission to leave his assigned post at Pelham Rd. & Pelhamdale Ave..

By his actions P.O. Alali violated section 1.5 of this Department's Rules & Regulations.

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Letter of Reprimand |

Signature of Division Commander _CAPT. ROBERT GAZZOLA._     Date _26 Dec 2002_

**To Be Completed By Officer Charged:**

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( ✓ ) **Accept** the finding and the proposed disciplinary action.

( ) **Decline** to accept any disciplinary action without a statutory hearing.

Officer's Signature _____    Date _26 DEC 02_    Witnessed by: _____

CO 1A


DEFENDANT'S
EXHIBIT
A A

**New Rochelle Police Department**
**Rules and Regulations**

| Chapter: | One | | Date Effective: | 01 Jan 97 |
|---|---|---|---|---|
| Subject: | **Performance Standards & Related Conduct** | Page 1 of 6 | Date Revised: | 22 Mar 02 |

1.1.    All members of the Department will adhere to all established departmental policies and procedures.

1.2.    Members of the Department will perform their assigned duties in a competent manner. Members are accountable for their actions and cannot avoid the responsibilities of their positions. Included within incompetent performance but not limited are the following:

a)   Unwillingness to perform assigned tasks
b)   Failure to conform to work standards established for the member's rank or position
c)   Failure to take appropriate action at an incident needing police attention
d)   Failure to prepare legible and coherent reports
e)   Evaluations showing substandard performance

1.3.    Members of the Department will not engage in any activity or personal business that would cause them to neglect or be inattentive to their duties.

1.4.    Members of the Department assigned to duty outside of headquarters will not engage in conversations with other members of the Department for any other purpose than the exchange of information relative to the business of the Department. All such conversations will be as brief as possible.

1.5.    Members of the Department assigned to motorized patrol, foot patrol, or a fixed post will not leave their designated area of patrol for any reason other than police necessity, personal necessity or meal period. Prior to leaving an assignment for personal necessity or meal period supervisory approval will be obtained and a memo book entry made. Meal periods are assigned on the work sheet and officers are allowed 30 minutes for meal. During times of heavy activity, meal periods may be readjusted or canceled on the authority of the Tour commander.

1.6.    Members of the Department will not walk foot patrol posts together unless authorized by competent authority. Motorized patrols will not congregate unless authorized by competent authority or in furtherance of authorized police activities.

1.7.    Members of the Department will aggressively patrol the area of their assigned responsibility and will note, report and investigate all unusual events and conditions. Failure to detect unusual events and conditions will be deemed neglect of duty.

1.8.    Members of the Department will promptly respond to all assigned calls for service.

1.9.    Members of the Department are responsible for properly and promptly answering the radio.

1.10.   The standard ten (10) codes will be used in dispatch procedures.

1.11.   Members of the Department will not make unnecessary or improper radio transmissions. Members will always identify themselves when transmitting over the radio.

1.12.   All calls for service will receive a CAD entry.

# Command Discipline Report
## New Rochelle Police Department

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD/2nd tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

### Summary of Investigation and Disposition of Complaint:

On 23 Dec 02, at 0750hrs. , Sgt. Giannotti saw P.O. Alali leaving Headquarters to begin his tour of duty without his uniform hat. When questioned by Sgt. Giannotti, P.O. Alali stated his hat was in the locker room. At 0805hrs. Headquarters attempted to raise P.O. Alali on the radio eight times without a response. Sgt. Giannotti located P.O. Alali exiting the Mirage Diner with a package. When questioned, P.O. Alali stated he did not hear Headquarters calling him. Sgt. Giannotti checked P.O. Alai's portable radio and found it to be in proper working order. Sgt. Giannotti then requested P.O. Alali produce his uniform hat. P.O. Alali did not have his hat on his person or in his vehicle.

By his actions, P.O. Alali violated sections 1.9 & 9.11 of this Department's Rules & Regulations

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Loss of one (1) Leave Day |

| Signature of Division Commander | Date |
|---|---|
| CAPT ROBERT GAZZOLA | 13 JAN 2003 |

**To Be Completed By Officer Charged:**

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( ✓ ) **Accept** the finding and the proposed disciplinary action.

(　) **Decline** to accept any disciplinary action without a statutory hearing.

| Officer's Signature | Date | Witnessed by: |
|---|---|---|
| PO | 13 JAN 03 | |

CO 1A

HP 08-03



DEFENDANT'S EXHIBIT CC

City Of New Rochelle
New York

Interdepartmental communication

To: Police Officer Araz Alali

From:  Captain Robert Gazzola

Subject: Proposed Disciplinary Action

Date: 6 Jan 03

1) Attached hereto please find a copy of charges against you alleging misconduct on your part.

2) A penalty of a Loss of one (1) Leave Day is proposed.

3) You have eight (8) days in which to answer this communication. Such answer shall be on the form attached or in similar form and must be in my office no later than_____.

   Should you fail to respond, such failure shall be construed as not contesting the proposed disciplinary action and accepting the proposed penalty therefore without a hearing.

4) You have the right to be represented by Counsel and / or other representative of your choosing.

**New Rochelle Police Department**
**Rules and Regulations**

| Chapter: | One | | Date Effective: | 01 Jan 97 |
|---|---|---|---|---|
| Subject: | **Performance Standards & Related Conduct** | Page 1 of 6 | Date Revised: | 22 Mar 02 |

1.1.   All members of the Department will adhere to all established departmental policies and procedures.

1.2.   Members of the Department will perform their assigned duties in a competent manner. Members are accountable for their actions and cannot avoid the responsibilities of their positions. Included within incompetent performance but not limited are the following:

   a)   Unwillingness to perform assigned tasks
   b)   Failure to conform to work standards established for the member's rank or position
   c)   Failure to take appropriate action at an incident needing police attention
   d)   Failure to prepare legible and coherent reports
   e)   Evaluations showing substandard performance

1.3.   Members of the Department will not engage in any activity or personal business that would cause them to neglect or be inattentive to their duties.

1.4.   Members of the Department assigned to duty outside of headquarters will not engage in conversations with other members of the Department for any other purpose than the exchange of information relative to the business of the Department. All such conversations will be as brief as possible.

1.5.   Members of the Department assigned to motorized patrol, foot patrol, or a fixed post will not leave their designated area of patrol for any reason other than police necessity, personal necessity or meal period. Prior to leaving an assignment for personal necessity or meal period supervisory approval will be obtained and a memo book entry made. Meal periods are assigned on the work sheet and officers are allowed 30 minutes for meal. During times of heavy activity, meal periods may be readjusted or canceled on the authority of the Tour commander.

1.6.   Members of the Department will not walk foot patrol posts together unless authorized by competent authority. Motorized patrols will not congregate unless authorized by competent authority or in furtherance of authorized police activities.

1.7.   Members of the Department will aggressively patrol the area of their assigned responsibility and will note, report and investigate all unusual events and conditions. Failure to detect unusual events and conditions will be deemed neglect of duty.

1.8.   Members of the Department will promptly respond to all assigned calls for service.

1.9.   Members of the Department are responsible for properly and promptly answering the radio.

1.10.   The standard ten (10) codes will be used in dispatch procedures.

1.11.   Members of the Department will not make unnecessary or improper radio transmissions. Members will always identify themselves when transmitting over the radio.

1.12.   All calls for service will receive a CAD entry.

## Command Discipline Report
## New Rochelle Police Department

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD/2nd tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

Summary of Investigation and Disposition of Complaint:

On January 19, 2005 at 1310 hrs, P.O. Araz Alali violated Chapter 2, Article 2.03, Section 3.5 of this Department's Manual of Procedure by being discourteous and unprofessional to a motorist during a traffic stop.

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Letter of Reprimand |

Signature of Division Commander                     Date

*CPT. ROBERT GAZZOLA*                     3/10/05

To Be Completed By Officer Charged:

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( ✓ ) Accept the finding and the proposed disciplinary action.

( ✓ ) ~~Decline to accept any disciplinary action~~ without a statutory hearing.

                                    05/10/05

Officer's Signature          Date          Witnessed by:

CO 1A


DEFENDANT'S
EXHIBIT
EE

City Of New Rochelle
New York

Interdepartmental communication

To: Police Officer Araz Alali

From: Captain Robert Gazzola

Subject: Letter of Reprimand

Date: 11 Feb 05

This letter of Reprimand is issued in connection with Command Discipline Number 6/05, which was served upon you on ___3/10/05___ and accepted by you on ___3/10/05___.

You are hereby formally reprimanded for the conduct stated in the above referenced Command Discipline. Failing to conduct yourself in a courteous and professional manner during a traffic stop interferes with the efficient and orderly operation of the Police Department.

You are hereby advised that any further misconduct on your part including, but not limited to, the conduct described above, will result in the imposition of discipline as provided for in Chapter 6 of the New Rochelle Police Departments Manual of Procedure and Article 75 of the New York State Civil Service Law.

cc:  Police Officer Edward Hayes, P.B.A. President
     Disciplinary file

City Of New Rochelle
New York

Interdepartmental communication

To: Police Officer Araz Alali

From:  Captain Robert Gazzola

Subject: Proposed Disciplinary Action

Date:  15 Feb 05

1) Attached hereto please find a copy of charges against you alleging misconduct on your part.

2) A penalty of a Letter of Reprimand is proposed.

3) You have eight (8) days in which to answer this communication. Such answer shall be on the form attached or in similar form and must be in my office no later than _____ MARCH 11, 2005

    Should you fail to respond, such failure shall be construed as not contesting the proposed disciplinary action and accepting the proposed penalty therefore without a hearing.

4) You have the right to be represented by Counsel and / or other representative of your choosing.

**New Rochelle Police Department**
**Manual of Procedure**

Subject: **Uniform Traffic Ticket and Enforcement Policy**

| | | |
|---|---|---|
| Chapter: Two | | Date Effective: 01 Jan 92 |
| Article: 2.03 | Page 1 of 3 | Date Revised: 16 Mar 98 |

**POLICY:** It is the policy of this Department to strictly enforce the Vehicle and Traffic Law.

**DEFINITION**

Uniform Traffic Ticket: The Uniform Traffic Ticket is issued by the State of New York and conforms to standards set by the Department of Motor Vehicles. The Uniform Traffic Ticket, commonly referred to as a "Summons", is issued in books of twenty (20). Each summons contains the original plus four copies. The motorist's copy (Yellow) is the fourth copy and will be issued to the motorist. All other copies will be placed in the summons safe at the police desk at the end of the tour.

All coded information required on the summons is readily found on the cardboard cover sheet of the summons book. Listed on the backside of the cover sheet is a log individually listing summons by date of issuance. The Department of Motor Vehicles does not mandate that this log be filled out, thus its use is optional.

**PROCEDURE**

1.  Books of summonses will be dispensed by the Records Unit, Monday through Friday from 0830 to 1630 hours. It will be the responsibility of each individual officer to be properly equipped with a sufficient supply of summonses on each tour. Officers are responsible for verifying that they have each summons assigned to them.

2.  Summonses will be written according to the following guidelines:

    2.1    A ball-point pen with black or dark blue ink will be used to fill out the summons

    2.2    Officers will legibly print all required information on the face of the summons

    2.3    Summonses will be accurately and completely filled out; ( Improperly written summonses are returned by the Department of Motor Vehicles)

    2.4    The verbal description of the violation must coincide with the statutory section and subsection of the Vehicle and Traffic Law cited

3.  When conducting a traffic stop, officers will conduct themselves in the following manner:

    3.1    A traffic stop will only be made when the officer reasonably suspects that the motorist has committed a traffic offense. Emergency lights will be activated, and, if necessary to attract the violator's attention, the siren will be activated. In instances where the officer feels his safety is at risk, he may make initial verbal contact with the operator by using the PA system. (Use of the PA system should not be used for routine traffic stops.)

    3.2    Whenever an officer makes a vehicle stop, he will notify the police dispatcher and advise him of his location, the reason for the stop, and the plate number of the vehicle stopped. This notification must be made prior to exiting the police vehicle.

    3.3    After exiting the police vehicle, the officer should carefully approach the violator's vehicle. The officer should stay on the driver's side of the vehicle and not walk between his vehicle and the violator's vehicle. A visual inspection of the rear seat of the violator's vehicle should be made before approaching the operator. The officer should then take up a position at the rear of the driver's door post and initiate contact with the vehicle operator.

**New Rochelle Police Department**
**Manual of Procedure**

Subject: **Uniform Traffic Ticket and Enforcement Policy**

| | | |
|---|---|---|
| Chapter: Two | | Date Effective:  01 Jan 92 |
| Article:   2.03 | Page 2 of 3 | Date Revised:   16 Mar 98 |

3.4    The officer will advise the vehicle operator of the reason for the stop and ask him for his driver's license, registration, and insurance card. The officer will ask the violator to hand him the requested documents and will not reach into the vehicle to accept them. (For safety reasons, it is important to keep the vehicle operator and any passengers at a physical disadvantage.)

3.5    An officer will be courteous and professional in his conversation with the violator. He will not scold or lecture the violator. Verbal Judo will be employed by the officer. The objective of traffic enforcement is to improve the driving performance of the motoring public. The focus of the stop should be the offense committed by the violator. Conduct on the officer's part that is less than professional suggests that the offense committed was not against the Vehicle and Traffic Law but was a personal affront to the officer and, as such, may lead the violator to feel that he is a victim and not an offender.

3.6    When a ticket is issued, the officer will explain the violation to the motorist and will tell the motorist when the ticket is returnable to the court. The motorist will also be given a schedule of fines.

3.7    After completing the stop the officer should not leave the scene until the violator has left.

4.    Unlicensed motorists who cannot provide positive identification will be arrested and required to post bail.

5.    Motorists who commit misdemeanors defined in the VTL will be arrested and required to post a minimum bail of $100.00. In those situations where an arrest is not practical (i.e. motorist hospitalized) or there are extenuating circumstances, a supervisor may authorize the issuance of a summons in lieu of an arrest. This exception does not apply to DWI or DWAI offenses.

6.    Whenever a motorist is arrested and charged with a VTL offense, the arrest number will be recorded in the upper right hand corner of the summons on the line above the box for the First Name. This number will be preceded by "NRPD."

7.    Officers will only check the box marked commercial vehicle located next to the date of birth box if the vehicle is a commercial vehicle as defined in ( VTL 501).

8.    Officers will complete the Section marked "Officer's Notes" prior to turning in the summons. Accurate notes will assist the officer who may have to later testify at trial.

9.    The minimum return date for a summons other than DWI or DWAI is two weeks.

10.    No motorist will be allowed to continue to drive a motor vehicle once the officer determines that the motorist is not properly licensed to drive or properly licensed to operate the class of vehicle the motorist is operating. In this situation the vehicle will either be released to a properly licensed driver or impounded.

11.    Officers must record the six digit US Department of Transportation number (USDOT ) of the responsible motor carrier responsible for the vehicle's load on tickets issued to drivers of commercial motor vehicles. A space is provided to record this number on the left hand side of the uniform traffic ticket adjacent to the affirmation. If an officer is unable to locate the USDOT# he will enter the default number of six zeroes. The USDOT# can be located on the side of the vehicle, rental/lease agreements, driver's log, or shipping papers.

**New Rochelle Police Department**
**Manual of Procedure**

Subject: **Uniform Traffic Ticket and Enforcement Policy**

| | | |
|---|---|---|
| Chapter: Two | | Date Effective:  01 Jan 92 |
| Article:   2.03 | Page 3 of 3 | Date Revised:   16 Mar 98 |

12. If a motorist is issued a summons for a felony VTL charge, the officer will not issue the motorist copy. Instead he will submit all copies of the summons to the court and file a felony complaint.

13. If an officer voids a summons, he will  advise his supervisor and submit the voided summons along with a PD 37A explaining the reason for the void to the Special Operations Unit commander or in his absence, the traffic sergeant. The PD37A will be co-signed by the officer's supervisor.

14. When a plainclothes officer in an unmarked vehicle effects a routine traffic stop, he will request that a uniformed officer in a marked radio car respond  to the scene. This will eliminate any questions about the identity of a plain clothes officer.

15. DWI checkpoints will not be conducted without the authorization of the tour commander, PACT commander or Special Operations Unit supervisors. A supervisor will be present at all times during the checkpoint. Cars will not be stopped in a random manner. A predetermined method, every third car for example, will be used.

**Command Discipline Report**
**New Rochelle Police Department**

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD/ 2nd tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

**Summary of Investigation and Disposition of Complaint:**

On April 14, 2005 P.O. Araz Alali was assigned to sector 4 in car #4. At approximately 0820 hrs Sgt. George Rosenbergen observed radio car #4, in sector one, parked directly in front of a "No Parking Anytime" sign at 96 Main Street, Dunkin Donuts. P.O. Alali has been advised by second tour supervisors, at least twice in the past three months, not to park his radio car illegally unless on an emergency call as this reflects poorly on the officer as well as the Department. P.O. Alali was not at this location on an emergency call for service.

By his actions P.O. Alali violated sections 1.5 & 2.3 of this Department's Rules & Regulations.

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Loss of Two (2) Leave Days |

| Signature of Division Commander | Date |
|---|---|
| *Cpt Molloy* | 6/29/05 |

**To Be Completed By Officer Charged:**

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( ✓ ) **Accept** the finding and the proposed disciplinary action.

( ) Decline to accept any disciplinary action without a statutory hearing.

| Officer's Signature | Date | Witnessed by: |
|---|---|---|
| *P.A.* | 06/29/05 | CAPT. ROBERT GAZZOLA |

CO 1A


DEFENDANT'S EXHIBIT
FF

**New Rochelle Police Department**
**Rules and Regulations**

| | | | |
|---|---|---|---|
| Chapter: | Two | | Date Effective: 01 Jan 97 |
| Subject: | **Personal and Professional Conduct** | Page 1 of 5 | Date Revised: 01 Jun 02 |

2.1.    Members of the Department shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department or that which impairs the operation or efficiency of the Department or officer.

2.2.    Members of the Department shall maintain a level of moral conduct in their personal and business affairs, which is in keeping with the highest standards of the law enforcement profession. Officers shall not participate in any conduct involving moral turpitude that impairs their ability to perform as law enforcement officers or causes the Department to be brought into disrepute.

2.3.    Members of the Department shall obey all laws of the United States, the State of New York and the City of New Rochelle. A violation of any law will be considered a departmental disciplinary offense as well as an illegal act subjecting the violator to criminal penalties.

2.4.    All members of the Department shall be courteous and tactful in the performance of their duties and shall demonstrate patience and discretion when dealing with the public.

2.5.    In the performance of their duty, members of the Department shall not engage in any type of activity which expresses prejudice concerning race, sex, religion, politics, national origin, lifestyle or similar personal characteristics.

2.6.    No member of the Department shall harass any other member of the Department or any member of the public. Sexual harassment in the workplace is illegal, and all employees are forbidden from engaging in such activity. No member of the Department shall make any unwarranted sexual advances toward any other member of the Department or member of the public. Sexual advances in the workplace can be defined as any physical, verbal or non-verbal behavior (gestures, displaying pornographic objects, pictures etc.,) that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. Supervisory officers shall not use their official authority to make sexual advances toward subordinate personnel.

2.7.    Supervisory personnel will take proper disciplinary action when and where it is evident that members of the Department, under their command, are engaging in conduct characterized as discourteous, prejudicial, or harassing. In all instances, notification to the appropriate Division Commander will be made.

2.8.    Conduct detrimental to the good order, efficiency or discipline of the Department, though not specifically provided for in these Rules and Regulations, shall be prohibited. Members found guilty thereof shall be punished in a manner deemed appropriate by the Police Commissioner.

2.9.    Sworn members of the Department shall be fit for and subject to duty at all times except when on sick report.

2.10.    No member of the Department shall use or possess marijuana or illegal drugs.

**Command Discipline Report**
**New Rochelle Police Department**

| Officer's Name | Rank | Employee Number | Assignment |
|---|---|---|---|
| Araz Alali | Police Officer | 9551 | PSD / 2nd tour |

Investigation has been completed concerning the violation charged herein. The finding and the disciplinary action recommended are indicated below. You may accept the finding and the proposed disciplinary action or decline to accept the finding and the proposed disciplinary action in lieu of a statutory hearing on written charges before a hearing officer.

**Summary of Investigation and Disposition of Complaint:**

On June 15, 2006 at approximately 1220 hrs P.O. Alali responded to Pintard Ave from Pershing Square to assist other officers who had requested assistance making an arrest. While responding to Main Street and Pintard Avenue P.O. Alali proceeded through the red light at the intersection of Huguenot Street & Division Street at what appeared to be a high rate of speed without first slowing down. P.O. Alali than drove up onto the sidewalk IFO 330 Huguenot Street, which is at the intersection of Huguenot Street & Centre Avenue. It appeared that P.O. Alali could have gotten through the intersection without driving on the sidewalk. P.O. Alali's unsafe driving was compounded by the fact that he and the other responding units were advised twice by the officers on the scene that the incident was under control and the road supervisor advised that anyone not on the scene should disregard and resume patrol. All these transmissions were made before P.O. Alali reached the intersection of Huguenot Street & Division Street but P.O. Alali disregarded them and proceeded anyway.

By his actions P.O. Alali violated section 8.2 of this Department's Rules & Regulations.

| Finding | Disciplinary Action Recommended |
|---|---|
| Sustained | Loss of one (1) leave day |

Signature of Division Commander          Date

                                        8/29/06

**To Be Completed By Officer Charged:**

I understand that I do not have to accept the findings and the disciplinary action recommended by my commanding officer. My right to a statutory hearing before a hearing officer has been explained to me and I hereby voluntarily:

( . ) **Accept** the finding and the proposed disciplinary action.

( ✓ ) **Decline** to accept any disciplinary action without a statutory hearing.

Officer's Signature          Date 08/29/06          Witnessed by:

                                                    CAPT. GAZZOLA

CO 1A


DEFENDANT'S EXHIBIT
GG

City Of New Rochelle
New York

Interdepartmental communication

To: Police Officer Araz Alali

From: Captain Robert Gazzola

Subject: Proposed Disciplinary Action

Date: 8 Aug 06

1) Attached hereto please find a copy of charges against you alleging misconduct on your part.

2) A penalty of a Loss of one (1) leave day is proposed.

3) You have eight (8) days in which to answer this communication. Such answer shall be on the form attached or in similar form and must be in my office no later than _Aug. 29, 2009_ EXTENDED DUE TO VACATION (RG)

   Should you fail to respond, such failure shall be construed as not contesting the proposed disciplinary action and accepting the proposed penalty therefore without a hearing.

4) You have the right to be represented by Counsel and / or other representative of your choosing.



STATE OF NEW YORK
CITY OF NEW ROCHELLE

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In the Matter of the Disciplinary Charges
Preferred by

CAPTAIN ROBERT GAZZOLA,                                    **CHARGES AND**
                                                          **SPECIFICATIONS**
                       Charging Party,

        - against -

POLICE OFFICER ARAZ ALALI,

                       Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        Pursuant to applicable provisions of law, disciplinary charges are hereby preferred

against you as follows:

---

## CHARGE I – MISCONDUCT

### Specification 1

### Reckless Operation of a Department Vehicle

        Rule 8.2 of the Rules and Regulations of the City of New Rochelle Police Department

provides, in part, that members of the Department will operate Department vehicles in a careful

and prudent manner in accordance with all Vehicle and Traffic laws and Departmental

DEFENDANT'S
EXHIBIT

procedures, giving highest priority to the safety and welfare of the general public and to avoiding injuries to persons or damage to property. On or about June 15, 2006 at approximately 1220 hours, while operating Department vehicle RC #18 in or near Pershing Square, you responded to a request for assistance made by other New Rochelle police officers who were making or attempting to make an arrest on Pintard Avenue. While responding to Main Street and Pintard Avenue, you were driving at a high rate of speed and proceeded through a red light at the intersection of Huguenot Street and Division Avenue without slowing down. While at the intersection of Huguenot Street and Centre Avenue, you drove up onto the sidewalk in front of 330 Huguenot Street, although it did not appear necessary to do so. Your reckless operation of a Department vehicle constitutes misconduct in violation of Rule 8.2 of the Rules and Regulations of the City of New Rochelle Police Department.

## Specification 2

### Reckless Operation of a Department Vehicle

Rule 8.2 of the Rules and Regulations of the City of New Rochelle Police Department provides, in part, that members of the Department will operate Department vehicles in a careful and prudent manner in accordance with all Vehicle and Traffic laws and Departmental procedures, giving highest priority to the safety and welfare of the general public and to avoiding injuries to persons or damage to property. On or about June 15, 2006 at approximately 1220 hours, while operating Department vehicle RC #18 in or near Pershing Square, you responded to a request for assistance made by other New Rochelle police officers who were making or attempting to make an arrest on Pintard Avenue. While responding to Main Street and Pintard Avenue, you were driving at a high rate of speed and proceeded through a red light at the

2

intersection of Huguenot Street and Division Avenue without slowing down.    Before you reached the intersection of Huguenot Street and Centre Avenue, you and all other responding units were advised twice by the officers already on the scene that the incident was under control, and a road supervisor advised that anyone not already on the scene should disregard and resume patrol.    Despite this, you continued to respond to the call and while at the intersection of Huguenot Street and Centre Avenue, you drove up onto the sidewalk in front of 330 Huguenot Street, although it did not appear necessary to do so,    Your reckless operation of a Department vehicle after being advised that assistance was no longer necessary and to disregard the call and resume patrol constitutes misconduct in violation of Rule 8.2 of the Rules and Regulations of the City of New Rochelle Police Department.

## CHARGE II – MISCONDUCT

### Specification 1

### Failure to Log On To Video Camera

Articles 2.11 and 2.12 of the Department's Manual of Procedure provides that when an officer is assigned a Department vehicle with an in car video camera system, he/she must log on to the camera system at the commencement of his/her tour of duty.  On or about September 16, 2006 you were assigned to Department vehicle RC #18, which is equipped with an in car video camera system.  At approximately 0830 hours on that date, you performed a traffic stop opposite 301 North Avenue, during which you claim that the motorist became violent and attempted to strike you.  You radioed for assistance and the motorist was arrested and charged with Assault. You received a minor injury to your right arm.  When the Department attempted to view the

video of the traffic stop, there was no video to view because you failed to log on to the vehicle's video camera system. The video camera system in Department vehicle RC # 18 was functioning properly on that date and there was no malfunction. Your failure to log on to the video camera system at the beginning of your tour as required is a failure to adhere to established Department policies and procedures and constitutes misconduct in violation of Rule 1.1 of the Rules and Regulations of the City of New Rochelle Police Department.

## CHARGE III – MISCONDUCT

### Specification 1

#### Leaving Designated Area of Patrol

Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department provides in part that members assigned to a designated patrol area may not leave their designated area of patrol except for police necessity, personal necessity or meal period. During the period June 3, 2006 through September 12, 2006, your designated area of patrol was North Avenue between Hamilton Avenue and Main Street. Although you were advised that you were to remain within your designated area of patrol, on numerous occasions you issued parking violation summonses outside of your designated patrol area, including but not limited to the following dates: 6/3/06, 6/6/06, 6/8/06, 6/9/06, 6/12/06, 6/20/06, 7/10/06, 7/14/06, 7/15/06, 7/21/06, 7/23/06, 7/24/06, 7/27/06, 8/3/06, 8/4/06, 8/5/06, 8/9/06, 8/10/06, 8/11/06, 8/12/06, 8/15/06, 8/18/06, 8/22/06, 8/24/06, 8/28/06, 8/29/06, 8/30/06, 8/31/06, 9/3/06, 9/4/06, 9/9/06, 9/10/06, 9/11/06 and 9/12/06. Your actions constitute misconduct in violation of Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department.

## Specification 2

### Leaving Designated Area of Patrol

Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department provides in part that members assigned to a designated patrol area may not leave their designated area of patrol except for police necessity, personal necessity or meal period. During the period June 3, 2006 through September 12, 2006, your designated area of patrol was North Avenue between Hamilton Avenue and Main Street. Although you were advised that you were to remain within your designated area of patrol, on numerous occasions you issued Uniform Traffic Tickets outside of your designated patrol area, including but not limited to the following dates: 6/16/06, 6/20/06, 7/14/06, 7/15/06, 7/17/06, 7/21/06, 7/23/06, 7/24/06, 7/27/06, 8/2/06, 8/3/06, 8/4/06, 8/9/06, 8/16/06, 8/18/06, 8/22/06 and 9/11/06. Your actions constitute misconduct in violation of Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department.

## Specification 3

### Insubordination

Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department provides in part that members assigned to a designated patrol area may not leave their designated area of patrol except for police necessity, personal necessity or meal period. During the period June 3, 2006 through September 12, 2006, your designated area of patrol was North Avenue between Hamilton Avenue and Main Street. Although you were advised that you were to remain within your designated area of patrol, on numerous occasions you issued parking violations summonses and Uniform Traffic Tickets outside of your designated patrol area, including but not

limited to the following dates: 6/3/06, 6/6/06, 6/8/06, 6/9/06, 6/12/06, 6/16/06, 6/20/06, 7/10/06, 7/14/06, 7/15/06, 7/17/06, 7/21/06, 7/23/06, 7/24/06, 7/27/06, 8/2/06, 8/3/06, 8/4/06, 8/5/06, 8/9/06, 8/10/06, 8/11/06, 8/12/06, 8/15/06, 8/16/06, 8/18/06, 8/22/06, 8/24/06, 8/28/06, 8/29/06, 8/30/06, 8/31/06, 9/3/06, 9/4/06, 9/9/06, 9/10/06, 9/11/06 and 9/12/06. Although you were advised several times after you were assigned the above-stated designated area of patrol that this behavior is unacceptable, you continued to go outside of your designated patrol area. Your actions constitute insubordination.

## CHARGE IV – MISCONDUCT

### Specification 1

#### Failure to Maintain Memorandum Book

Rule 1.28 of the Rules and Regulations of the City of New Rochelle Police Department provides, in part, that all sergeants, uniformed detectives, police officers and non-sworn uniformed personnel assigned to street duty will be provided with a memorandum book and that on each tour of duty the day, date, tour, post assigned, weather conditions, meal period, special assignments, local alarms and a complete and accurate accounting of all duty performed and post conditions will be entered into the memorandum book. During the period June 9, 2006 through September 3, 2006 you were assigned to street duty. During this same period of time, you made only 5 entries in your memorandum book. Your failure to maintain your memorandum book constitutes misconduct in violation of Rule 1.28 of the Rules and Regulations of the City of New Rochelle Police Department.

## CHARGE V - MISCONDUCT

### Specification 1

### Failure To Call Out On Meal Period/Off Post

Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department provides in part that members assigned to motorized patrol, foot patrol or a fixed post may not leave their designated area of patrol except for police necessity, personal necessity or meal period, that prior to leaving an assignment for personal necessity or meal period supervisory approval must first be obtained, and that when an officer calls out of service he/she must notify the dispatcher of the reason and his/her location. On September 10, 2006 your designated area of patrol was North Avenue between Hamilton Avenue and Main Street. On that date you left your designated area of patrol to take a meal period, but failed to obtain supervisory approval to leave your post and failed to advise the Department that you were leaving your post. Your actions constitute misconduct in violation of Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department.

### Specification 2

### Insubordination

Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department provides in part that members assigned to motorized patrol, foot patrol or a fixed post may not leave their designated area of patrol except for police necessity, personal necessity or meal period, that prior to leaving an assignment for personal necessity or meal period supervisory approval must first be obtained, and that when an officer calls out of service he/she must notify the dispatcher of the reason and his/her location. On September 10, 2006 your designated area of

patrol was North Avenue between Hamilton Avenue and Main Street. On that date you left your designated area of patrol to take a meal period, but failed to obtain supervisory approval to leave your post and failed to advise the Department that you were leaving your post. On or about November 22, 2002 you received a letter of reprimand for a violation of Rule 1.5 of the Rules and Regulations of the City of New Rochelle Police Department for being off your assigned post and at another diner in the City of New Rochelle. Your conduct on September 10, 2006 after being warned about similar misconduct in the past constitutes insubordination.

You are entitled to answer the above charges. The answer is due eight (8) days after the charges are served upon you, not counting the day you receive the charges. The answer should be served upon Captain Gazzola at his office at the City of New Rochelle Police Department.

You are entitled to a hearing on the charges and to be represented by an attorney. A transcript will be made of the proceedings and you should be prepared at the hearing to present such witnesses and other proof as you have in your defense against the charges.

You will be advised of the time and place of the hearing. If you are found guilty of the above charges, the penalty or punishment imposed upon you may consist of dismissal from the Department, demotion in grade or title, suspension without pay, a fine, or a reprimand. The penalty being sought is a 30-day suspension without pay. All future correspondence regarding this matter will be served upon you at your last address on file with the Department unless you advise me to the contrary.

Dated: 2/15/07

CAPTAIN ROBERT GAZZOLA

8

# New Rochelle Police Department

## Employee Performance Appraisal

Name:    Araz Alali        Rank:    Police Officer        Employee Number:9551

Current Assignment:    Patrol 2nd Tour

Rating Period:    From    Nov 26 ,2004        To    Dec. 31,2004

Days Absent in Rating Period:    Sick _5____    Injured __172    Vacation _0____

Productivity:

**Summonses**    UTT    136    PVS    185    City Code    36

**Arrests**    Felony    2        Misdemeanor    6        Other    8

**Calls for Service**        Incident Reports    153    Accident Report_____7_____

**Narrative:**

Police Officer Araz Alali has been employed by this department since 2002 after transferring from the NYPD. He was assigned to the 1st tour for most of the year and was reassigned to the 2nd tour on November 26. After arriving on the 2nd tour Officer Alali spent a week working in communications before going on the road.

During the brief period of time that I had to personally observe Officer Alali, he had a generally acceptable attitude towards the department and his job. However, at times he would show some displeasure when receiving an undesirable assignment, such as a prisoner transports or foot post detail. Officer Alali seems to had good job knowledge and he handles his details in an efficient and timely manner and didn't need additional supervision to complete details. He writes clear and concise reports and his notebook is up to date and detailed. Officer Alali displays an exemplary appearance. His uniform is always neat and properly maintained. Officer Alali has great initiative and is clearly one of the most productive members of the department. His City Code and V&T totals would be outstanding full year totals, but considering he missed 172 work days due to and on duty injury makes them dramatic.

Officer Alali is very aggressive, sometimes overly aggressive and this aggressiveness leads to many of his problems. Officer Alali has to be reminded that he needs to advise Central when he does a vehicle stop and give his location even if he has a computer in his vehicle. Officer Alali also seems to have problems orally communicating with the public. The manifestation of this shortcoming is 3 civilian complaints for discourtesy for the year. This communication problem is one that Officer Alali needs to address in the upcoming year. Officer Alali appears to have good investigative skills, judging by his arrest totals. Officer Alali's aggressiveness should be encouraged but improvement in his demeanor and ability to communicate with the public also must also be stressed in the next rating period. Officer Alali was not on the sick abusive list and did not receive any negative discipline during the rating period.

Officer Alali meets standards for the rating period

Below Standard____    Meets Standard_X_    Above Standard____        (use other side if necessary)

_____        22 JAN 05        _____        22 JAN 05
Employee's Signature        Date        Evaluator's Signature        Date

_____        1/22/05        _____        2/1/05
Tour/Unit Commander        Date        Division Commander        Date

_____        _____        _____        _____
Deputy Police Commissioner        Date        Police Commissioner        Date

PD 118
typewritten                                Form must be

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION



*Cayff 10/5/05*

**TO:**       Police Officer Araz Alali
**FROM:**     Sergeant Austin
**DATE:**     29 September 2005
**SUBJECT:**  Letter of counsel

    The Purpose of this communication is to counsel you regarding your current work performance, and the department's expectations of your future work performance.

### Current work performance

    In your current assignment to second tour Patrol your main functions are to perform any assignment or detail you are assigned in the course of your duty in a manner appropriate with Departmental guidelines and practice.

    To date in 2005 you have issued 358 moving violations, 321 parking violations and 3 city code summonses. You have had 37 arrests until 15 August 2005.

    5 sick days have been used.

    You are a highly active and productive officer which is supported by the statistics. You initiate calls for service when needed. In most areas of enforcement you are well above the average for second tour. With your productivity and arrests statistics you could be considered for specialized units.

### Issues

    In your time in New Rochelle you have had several citizen complaints and several Department initiated complaints. Also several Supervisors have had meetings with you to discuss department policy and expectations. Due to these issues I have been assigned to ride with you in various capacities and observe you handling of incidents and your interactions with the public.

    From these reports and my observations during this time the following issues should be addressed.

    On Traffic stops you frequently fail to call out car stops prior to making contact with the operator. I have also observed you not adhering to Department Guidelines on use of Verbal Judo when addressing the operator.

    On several occasions you required forms or summons that you did not have with you. Other units responded with needed materials such as accident reports or city code summonsed.

    Your productivity regarding UTT's and parking violations is above average. However you have issued only 3 City Code summonses for the year.

DEFENDANT'S EXHIBIT
Z

# CITY OF NEW ROCHELLE
# NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

In situations where your authority is challenged or the subject is disrespectful it has been observed that you get upset at the challenge and will continue an argument when it is not called for. This only serves to escalate the situation instead of diffusing it as is your responsibility. This is possibly the source of some complaints you have had.

While you actively patrol your areas of assignment your focus is on the primary roads in that area. Your priority seems to be mainly looking for vehicle violations. While this is an important component of patrol there are other needs the Department requires. You are to give due attention to all areas including side roads. Your patrol is also intended for you to be familiar with the people in the areas you are assigned and their concerns for the area such as quality of life issues and desire for a Police presence even if no active enforcement is needed or desirable. Frequent traffic stops are a way to encourage compliance with traffic laws, Discretion can and should be used on stops and other interactions with minor offenses. Often times other considerations need to be taken into account such as the benefit of the enforcement, manpower requirements, other incidents needing attention as well as whether the enforcement can be followed up at a later time without detriment to the community.

You had several Traffic stops where arrests were made due to either drugs or weapons found in plain view. Concerns were raised as to the blatant nature of the observed items and the short time frame these occurred in. These stops occurred prior to my assignment with you and were discussed previously. All Laws and Department policies regarding search and seizure should be followed.

While riding with you I have observed you become aggravated with Department policies you do not agree with or feel are handled better by other departments. Also in the past you have received department discipline after being advised of Department rules you were violating and you did not correct the condition. New Rochelle has its guidelines and is not required to follow other departments. Difference of opinion is understood, but you are required to follow New Rochelle Policy and Procedure. Proper channels are available to register disagreement with those guidelines.

### Expected Work Performance

Your work performance in some areas is above average levels. What is required is to follow Department guidelines regardless if you feel them necessary or if the purpose behind them is clear. You are expected to continue to properly enforce violations and other required police actions. You are also expected to be a more rounded officer addressing other needs of the community other than just enforcement.

The following are areas you need to ensure you are familiar with and comply with department expectations;

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

1-Traffic stops are to follow Department Rule regarding calling out stops, use of verbal judo, and other procedures. R&R Ch1, Sub 1.13, MOP Ch 2, Art 2.03

2-Required equipment will be carried, for example, all necessary summonses, required uniform equipment and reports and forms needed for patrol. Ensuring vehicle is properly stocked. R&R Ch 9, Sub 9.47. R&R Ch 8, Sub 8.4

3-Patrol and be familiar with all streets of assigned areas as well as primary roads. R&R Ch 1, Sub 1.7

4- Use discretion in dealing with the public when issuing summonses or making a arrest. R&R Ch 2, Sub 2.4, MOP Ch 1, Art 1.01

5- Maintain composure in situations where your authority is challenged or discourteous is directed at you but no other reason for action is present .Use Verbal Judo as per MOP Ch5, Art 5.31, R&R Ch 2,2.4

6- Enforce violations of the City Code when appropriate. R&R Ch1, Sub 1.2. MOP Ch 5, Art 5.26

7- Follow search and seizure laws and Department policy regarding same. MOP Ch 1, Art 1.01, MOP Ch 3, Art 3.06

8- Follow proper use of 10 codes including calling out on scene and calling clear from scene. R&R Ch1, Sub 1.10, MOP Ch 7, Art 7.01,

9- Obey and comply with any lawful order given by a superior officer. R&R Ch 2, Sub 2.39

These have been discussed previously and are listed in MOP/R&R .You should be familiar with all Department policies and procedures and should follow same. Failure to follow department guidelines would lead me to conclude that you are "unwilling" to conform to work standards established for your position in violation of R&R Ch 1, Sub 1.2.

I have read and understand the above communication.

Police Officer Araz Alali _however I do not agree with the findings_

Witnesses:
Sgt. Edward Austin _Sgt E Austin_

Lt. William Schulman _W Schulman_

# New Rochelle Police Department

## Employee Performance Appraisal

Name:  Alali, Araz          Rank:  Police Officer          Employee Number: 9551

Current Assignment:  PSD-Second tour

Rating Period:  From  01 January 2005          To  31 December 2005

Days Absent in Rating Period:  Sick  5     Injured  0     Vacation  5

Productivity:

**Summonses**   UTT  476     PVS  414     City Code  8

**Arrests**   Felony  10     Misdemeanor  49     Other  6

**Calls for Service**   Incident Reports  622     Accident Report  49

Narrative:

PO Alali has been employed by NRPD since February 2002. Prior to that he was with the NYPD. He is currently on second tour assigned primarily to north end sectors. PO Alali is an extremely active officer and leads the tour in arrests and moving violation summonses. However these statistics do not fully indicate Officer Alali's effectiveness as a Police Officer. This year he has also led the Department in citizen complaints with six. These complaints have primarily been for discourtesy. Most have not resulted in disciplinary action due to the lack of evidence. One resulted in a written reprimand. Also frequently PO Alali has had meetings with PSD Captain, second tour commander and several other second tour supervisors. These meetings were primarily for advice on Department expectations. Officer Alali attempted to conform closer to expectations for a time but would again begin to perform as he desired. This culminated in my riding with Officer Alali for approximately one month from 31 August until the end of September. In this time several issues were noted and a letter of counsel was written. This documented Department regulations to be followed and that all Officers are responsible to follow. Officer Alali stated his strong disagreement to the letter. There were several meetings between PO Alali and the Captain, Second tour Lieutenant and myself to discuss it. PO Alali continued with his contention that he felt he was correct in his methods and did not agree with the letter of counsel. Since riding with him he has begun writing more city code summonses and appears to be trying not to be as focused on vehicle stops. PO Alali has failed several times to advise HQ of traffic stops. This has been brought to his attention many times in the past. He now seems to be making notification more frequently. I advised him on 09 Nov 2005 of a deficiency with his uniform for a severely worn gun belt. He corrected the problem and otherwise always presents a clean and neat appearance. Officer Alali's reports are poor, by being sloppy, hastily written and with minimal detail. This seems more due to lack of care and interest than a lack of ability. PO Alali believes he is unfairly targeted for criticism. He also does not agree with several Department policies. It appears he is disgruntled because of this and is not motivated to do more than the minimum necessary on incidents. Officer Alali received negative discipline from one incident. He was charged with leaving his sector without authorization and violating parking restrictions. This resulted in the loss of two days.

PO Alali used 5 sick days for 2005 and 5 vacation days.

DEFENDANT'S EXHIBIT

PO Alali needs to accept that he is responsible to follow Department policies and expectations even if the reason for them is not apparent. If he did this he could become a valuable member of the Department and an asset to specialized units. He has a strong work ethic and has had many good arrests. However his high productivity does not outweigh the problems experienced and apparent lack of ability to understand and follow Department expectations. Therefore Officer Alali does not meet Department standards for 2005.

Below Standard_X____    Meets Standard____    | Above Standard____    (use other side if necessary)

Employee's Signature            Date             Evaluator's Signature            Date

01/27/06                                          Sgt E Austr 8110f16    1/27/05

Tour/Unit Commander            Date             Division Commander            Date

1/25/68

Deputy Police Commissioner      Date             Police Commissioner            Date

PD 118                                            Form must be typewritten

*COPY*

# New Rochelle Police Department

## Employee Performance Appraisal

Name:  Araz Alali          Rank:  Police Officer          Employee Number: 9551

Current Assignment:  PSD  2nd Tour

Rating Period:  From  January 1, 2006          To  May 31, 2006

Days Absent in Rating Period:  Sick  5.5          Injured  0          Vacation  0

Productivity:

**Summonses**     UTT  142     PVS  123     City Code  16

**Arrests**     Felony  4     Misdemeanor  27     Other  2

**Calls for Service**     Incident Reports  219     Accident Report  13

**Narrative:**

Police Officer Alali has been employed by the New Rochelle Police Department since February 2002. He has been assigned to the second tour since November 2004. Officer Alali is currently assigned to work northern sectors of the city.

During the last rating period Officer Alali received a below standard evaluation from Sgt. Austin which necessitated this interim evaluation.
The primary issues that Officer Alali struggles with are his inability to understand, or his unwillingness to adhere to, department policies, and his lack of communication skills necessary to deal with the citizens of New Rochelle. To a lesser extent, Officer Alali also has problems with report writing and lack of discretion. These issues have been discussed with Officer Alali and were outlined in a letter of counsel he received last year from Sgt. Austin.
During the first five months of this year, Officer Alali has been assigned to work almost exclusively in sectors eight and nine. During this time, Officer Alali has had good enforcement statistics. He leads the tour in most categories and has improved on his city code enforcement, which was an area of deficiency last year. There is little doubt that Officer Alali focuses mainly on V&T enforcement when working and does a good job in that area. However, because of his single-minded focus on enforcement he is ignoring the other



responsibilities of a sector officer. New Rochelle PD is a public service oriented Police Department and Officer Alali needs to improve his communication skills in order to leave a more positive impression with the citizens he comes into contact with.

Since Officer Alali works mostly sector 8 and 9 and subsequently I have rarely had the opportunity to directly observe him handle calls for service other than motor vehicle accidents and alarms. I did respond to one domestic dispute with Officer Alali and during the incident, he handled himself professionally and at no time was he discourteous. However, calls for service have not been a problem area for Officer Alali. His most troublesome area has been and continues to be, the number of complaints he accumulates. In 2005, Officer Alali received six civilian complaints. Thus far, in May 2006, Officer Alali has already received four complaints. Clearly, he is not improving from last year. The four complaints are as follows:

- 1 Excessive force (pending).
- 2 Discourtesy (unsubstantiated).
- 3 Miscellaneous complaint about Officer Alalis' driving habits (counseled).
- 4 Abuse of authority.

The last complaint is still pending the outcome of the internal affairs investigation.

A major problem with the complaints that Officer Alali has received is that the complainants in two of the incidents state that their contact with Officer Alali has diminished their opinion of the New Rochelle Police Department as a whole. Officer Alali needs to understand that any contact with the public that ends in a civilian complaint whether substantiated or not is a negative for the entire Department. It seems that when his authority is challenged, particularly during car stops, instead of just issuing the summons and leaving, which at least, would not escalate the confrontation, he contributes to the agitation of the motorist by issuing a seemingly punitive number of summonses. These actions lead to civilian complaints.

Another issue outlined by Sgt. Austin is a lack of discretion on the part of Officer Alali. Officer Alali has made several good arrests over the last few months, including a gun arrest and several drug arrests. However, he seems to be unable to weigh the value of an arrest for minor infractions with the value of officer safety and considerations of available manpower.

In the last rating period, Officer Alali seemed to have trouble following the rules and regulations of the department. This rating period there have been no documented occurrences of rule violations on the part of

Officer Alali. This is an area that he has improved upon over last year.

Officer Alalis' report writing was also a problem area last year. Early this year Officer Alali conducted an excellent investigation that resulted in the arrest of several suspects who were charged with various serious penal law violations, including Burglary. Unfortunately the reports and statements that he submitted were badly flawed because they included sexually explicit statements by a suspect that were unnecessary in the context of the crimes committed for the reports and statements. The unnecessary inclusion of those statements into the reports overshadowed what was an outstanding investigation conducted by Officer Alali. Nevertheless, since that incident his report writing has improved. He now seems to understand how much detail needs to be documented for a given incident.

Officer Alali has used 5.5 sick days to date which is more than he used all of last year, but the days were used in only two incidents.

Officer Alali was used for two weeks in the Communications Unit as a dispatcher and adapted very well to the task. He also trained with PO Labarbera on the duties of the Court officer. Officer Alali did perform these tasks but not without voicing some displeasure.

Officer Alali has good street patrol level investigative skills and has made many high-quality car stop based arrests.

Because of his initiative, productivity, and investigative skills, I believe that Officer Alali would be above standards if he could improve in the areas of discretion and communication skills. Officer Alali is deficient in those areas, and it seems the combination of a lack of communication skills and the lack of discretion results in civilian complaints.

I believe that Officer Alali can improve in those areas in the upcoming rating period. When Officer Alali improves in those areas, he will be a meets standard or an above standard officer. Until that time, Officer Alali will remain below standards.

I rate Officer Alali below standard for the rating period.

*I do not agree w/ the finding*

(use other side if necessary)

Below Standard__X__    Meets Standard_____    Above Standard_____

| | | | |
|---|---|---|---|
| _Employee's Signature_ | 6/1/06 _Date_ | _Evaluator's Signature_ | 6/1/06 _Date_ |
| _Tour/Unit Commander_ | 6/1/06 _Date_ | _Division Commander_ | 6/2/06 _Date_ |
| _____ Deputy Police Commissioner | _____ Date | _____ Police Commissioner | _____ Date |

PD 118
typewritten

Form must be

# New Rochelle Police Department

## Employee Performance Appraisal

Name:  Araz Alali          Rank:  Police Officer          Employee Number: 9551

Current Assignment:  2nd Tour PSD

Rating Period:  From  January 1, 2006          To  December 31, 2006

Days Absent in Rating Period:    Sick  13.5        Injured  0        Vacation  15

Productivity:

**Summonses**   UTT    383    PVS    976    City Code    42

**Arrests**    Felony    6    Misdemeanor    37    Other    2

**Calls for Service**    Incident Reports    290    Accident Report    14

**Narrative:**

Police Officer Araz Alali has been employed by the New Rochelle Police Department since 2002. In the last rating period of 2005 Officer Alali received a below standard evaluation. This necessitated close monitoring of his performance and frequent evaluations of his progress during the rating period.

For the first six months of the year, Officer Alali was primarily assigned to work sectors eight and nine. During that time his vehicle & traffic and parking enforcement statistics were excellent, though compiling impressive enforcement statistics has never been a problem for Officer Alali. He has been at or near the top of the department in most categories since his arrival in 2002. The problem with Officer Alali while working in the north end was the fact that he did not patrol all areas of his sector and paid little or no attention to quality of life issues affecting those areas. Instead, he chose to focus on main roads and parkway off-ramps. However, Officer Alali displayed good job knowledge and conducted some good investigations that led to quality arrests. One particular investigation led to the arrest of two people. One person was charged with criminal mischief and the other possession of stolen property.

In June, Officer Alali was reassigned to a traffic detail meant to alleviate the congestion that plagues North Avenue between Hamilton Avenue and Main Street. Officer Alali continued to display his ability to write summonses and I believe he was improving the problem of traffic congestion on his post. However, his lack of discretion and communication skills led to civilian complaints. For example, Officer Alali was frequently issuing parking summonses while the driver was in the car. At that time, Officer Alali was advised that he and the department would be better served if he occasionally moved an illegally parked car along instead of issuing a parking ticket on a car with the driver in it.

There were some discipline issues during the rating period with Officer Alali. He had difficulty staying within his assigned area. He was often reminded of this, but he continued to stray from his post. I recommended departmental discipline for Officer Alali leaving his post on two occasions. There was also an incident where Officer Alali showed questionable judgment by driving recklessly while responding to assist another Officer even after being advised to disregard. Departmental discipline was recommended for this incident as well. I recommended Officer Alali receive departmental discipline four times during the rating period and I was advised by Lt.

DEFENDANT'S EXHIBIT

P

Fortunato that there are more charges pending.

During the rating period, Officer Alali received eight civilian complaints. Of the complaints filed, three were for abuse of authority. He was exonerated in one case and the other two are pending. Two complaints were for discourtesy. Both were unsubstantiated but he received counseling for one incident. He received two complaints for reckless driving. One complaint is pending charges and the other was unsubstantiated with Officer Alali receiving counseling. Officer Alali also received a complaint for excessive force. That complaint is pending.

In mid-September, Officer Alali was reassigned to the communications unit. Since his reassignment to the communications unit Officer Alali has had a good attitude and has performed very well in the unit as the dispatcher. There have not been any negative incidents since Officer Alali's reassignment. There has been an increase in Officer Alali's sick time this year and he received a warning letter regarding this.

Officer Alali continues to struggle with his communication skills and demeanor while dealing with the public. Officer Alali has a high number of negative contacts frequently resulting in civilian complaints. Civilian complaints and department discipline were negative issues last year and there has not been a discernible improvement over this rating period. If Officer Alali could improve upon his communication skills, demeanor, and an understanding of discretion, he could be an officer that meets standards. Until that time, he will remain a below standard Officer.

Police Officer Alali is below Standard for the rating period.

*I am signing to receipt of this evaluation ONLY. [It is] clearly rancorous, and vengeful. There are many fabrications and I will emphatically rebut them with a letter within the next few days. J.S.*

(use other side if necessary)

| Below Standard X | Meets Standard | Above Standard |
|---|---|---|
| J.A. | 02/07/07 | |

Employee's Signature     Date     Evaluator's Signature     Date

Tour/Unit Commander     Date 2/2/07     Division Commander     Date

Deputy Police Commissioner     Date     Police Commissioner     Date

PD 118                                    Form must be typewritten

9146542307

# New Rochelle Police Department

## Employee Performance Appraisal

Name:  Araz Alali          Rank:   Police Officer        Employee
Number:____9551__

Current Assignment:  PSD

Rating Period:  From   January 1, 2007          To   May 31, 2007

Days Absent in Rating Period:   Sick ___7_____   Injured ___0___   Vacation _0____

Productivity:

**Summonses**   UTT   167   PVS   132   City Code   5

**Arrests**   Felony   0   Misdemeanor   19   Other   0

**Calls for Service**   Incident Reports   180   Accident Report___14__

**Narrative:**

   P.O. Alali was rated below standard for 2006 which necessitated this re-evaluation. The re-evaluation period was from March 1, 2007 through May 31, 2007. P.O. Alali had been disciplined in 2006 because he had difficulty staying in his assigned area; however that has not been a problem during this evaluation period. Another area for concern was the amount of civilian complaints; however he has improved in that area as well with only one unsubstantiated complaint.

   P.O. Alali received a warning letter for the use of sick time in 2006. P.O. Alali has not improved in this area as he has used 2 full sick days and on six occasions has gone home sick during his tour of duty during this evaluation period alone. He has used 7 sick days so far in 2007.

   It was noted in his 2006 evaluation that P.O. Alali needed to improve upon his communication skills, demeanor, and his understanding of discretion. It is my opinion that he has not measurably improved in any of those areas.

   In addition, it has been noted that P.O. Alali has failed to maintain a proper memorandum book. There has been no improvement in this area as it was discovered by an immediate supervisor during this evaluation period that he was again in violation of Rules and Regulations section 1.29. Department discipline is pending in that matter.

   It is my opinion that P.O. Alali continues to perform below standard and requires close supervision.

*I clearly disagree with this evaluation. I am signing to/receipt of this evaluation only. A rebuttal letter will follow.*

(use other side if necessary)

Below Standard X     Meets Standard____     Above Standard____

_____     06/21/07     _____     6/21/07
Employee's Signature            Date       Evaluator's Signature        Date

_____     6/21/07     _____     6/21/07
Tour/Unit Commander            Date       Division Commander        Date

_____     _____     _____     _____
Deputy Police Commissioner        Date       Police Commissioner       Date

PD 118                                      Form must be type

DEFENDANT'S EXHIBIT
NN

# CITY OF NEW ROCHELLE
## NEW YORK

## INTERDEPARTMENTAL COMMUNICATION

**TO:**        Police Officer Araz Alali
**FROM:**      Captain Robert Gazzola, Commanding Officer
**DATE:**      July 25, 2007
**SUBJECT:**   Re-evaluation Review of your performance during the period of
               January 1, 2007 to May 31, 2007

After carefully reviewing your challenge to the rating you received on your 2006 Employee Performance Appraisal – Re-evaluation, and discussing the matter with the rater, Sergeant Brady, I am amending your appraisal to "meets standard." Therefore, the sanctions outlined in the Department Rules & Regulations, Chapter Two Section 2.47 no longer apply to you.

Cc:     Personnel File
        Attached to original 2006 Employee Performance Appraisal

**New Rochelle Police Department**
**Administrative Manual**

---

Personnel                                                          Page 38

---

### 12.7 RECORDS MAINTENANCE

All employment records gathered as part of the potential candidate's background investigation will be filed with the Staff Services Division. If the candidate is hired, the records will become a permanent part of candidate's personnel file. Personnel records of sworn employees will be maintained for a minimum of six years beyond the duration of their employment.

### 12.8 PROBATION

All police recruits serve a 64-week probationary period before receiving permanent civil service status. Police recruits will receive two interim evaluations and one final evaluation before receiving permanent civil service status.

### 12.9 OATH OF OFFICE

Upon being hired as a police officer the candidate will be sworn into office by the City Clerk.

## 13. PERFORMANCE EVALUATIONS

### 13.1 PERFORMANCE EVALUATION SYSTEM

A performance evaluation of every sworn employee will be conducted on an annual basis. The employee's immediate supervisor will do the performance evaluation. The employee is rated on the basis of his qualitative and quantitative performance. A list of rating factors is attached to the evaluation form and should be used as a guide in assessing the employee's performance.

The performance evaluation is limited to the rating period and the overall objective of the evaluation is to improve job performance.

The following rating factors should be considered when rating non-supervisory sworn employees:

- Attitude
- Initiative
- Job Knowledge
- Judgement
- Written Reports
- Dependability
- Sensitivity
- Demeanor
- Appearance
- Oral Communication
- Adaptability
- Problem Solving

The following rating factors should be considered when rating supervisory sworn employees:

- Attitude
- Initiative
- Job Knowledge
- Judgement
- Written Reports
- Dependability



**New Rochelle Police Department**
**Administrative Manual**

---

**Personnel**                                                                                      Page 39

---

- Sensitivity
- Demeanor
- Appearance
- Oral Communication
- Adaptability
- Leadership & Motivation Skills
- Decision Making
- Problem Solving
- Developing Subordinates
- Ability to Rate and Evaluate Subordinates

Each of the noted characteristics is defined on the Evaluation Form.

The rater will include within each performance evaluation a narrative comment that substantiates the rating given to the subject employee. The narrative will also include all recommendations that pertain to improving the employee's job performance.

At the time of the rating interview, the supervisor conducting the interview will review the evaluation with the employee and explain how the rating factors included in the evaluation relate to the employee's actual job performance. Before the review is ended, the rater will advise the employee about what is expected of him in the next rating period.

When a rater completes a performance evaluation of an employee, the rater will forward the evaluation to his immediate supervisor for review. After reviewing the evaluation, the rater's supervisor will sign off on it and forward it to the division commander for his review.

Each employee will be rated by his immediate supervisor. If the employee has more than one immediate supervisor, the supervisor designated to perform the evaluation will confer with the other supervisors before completing the evaluation.

Each employee will review the performance evaluation and have an interview with the rating supervisor. After the subject employee has reviewed the evaluation, the employee will sign the evaluation and indicate that he has reviewed it. The fact that an employee has signed the performance evaluation does not indicate that the employee agrees or disagrees with the rater's appraisal of the employee's performance. The sole purpose for the employee signature is to indicate that the employee has reviewed the evaluation and discussed it with the rater.

The performance evaluation will be forwarded to the rater's immediate supervisor and then to the division commander for review. The rater will discuss the evaluation with his superiors and provide supporting information in cases where an employee is given a below standard rating or a rating that classifies the employee as above standard.

In cases where an employee receives a below standard evaluation, the employee may forward a PD 37 to his division commander requesting an interview to discuss his performance evaluation. This request must be made no more than five days after the evaluation interview. An interview will be granted by the division commander; however, the employee will not be allowed to bring any witnesses or representatives to the interview. Any further action taken will be at the sole discretion of the division commander. Within two weeks after the interview the division commander will provide the employee with a written response to the employee's challenge of the evaluation.

**New Rochelle Police Department**
**Administrative Manual**

---

**Personnel**                                                                                    Page 40

---

When the division commander finds no merit to the employee's complaint, the written response will indicate that the complaint is "without merit" and that the division commander "concurs with the rater's appraisal." When the division commander finds that the employee's complaint is valid, he will ensure that the evaluation is properly amended.
The request for the review and whatever determination the division commander makes will become part of the employee's permanent personnel record.

Each employee is entitled to a copy of his performance evaluation. One will be provided upon the written request of the employee.

### 13.2 RATER TRAINING

Supervisors will annually receive training in performance evaluations. Division commanders will base part of a supervisor's evaluation on his ability to properly rate subordinates.

## 14. DISCIPLINE

### 14.1 RULES RELATED TO CONDUCT, APPEARANCE AND PERFORMANCE

Every sworn member of the Department will be issued a copy of the Administrative Manual, Rules and Regulations, and Manual of Procedure. Every non-sworn member of the Department will be issued a copy of those portions of the Rules and Regulations and Manual of Procedure that apply to his specific position in the Department.

### 14.2 COURT APPEARANCES AND RELATED CONDUCT

Chapter 7 and rules 9.50 through 9.55 of the Rules and Regulations pertain to court appearances and related conduct.

### 14.3 LEGISLATIVE RESTRICTIONS FOR POLICE OFFICERS

Alcohol Beverage Control Law Proscriptions. Under Section 128 of the ABC Law, no police officer is permitted to have any interest in the sale or manufacture of alcoholic beverages.

Political Activity. Rule 2.21 of Chapter Two of the Rules and Regulations outlines all proscribed political activity for police officers. This is in accordance with Section 17-110 of the New York State Election Law.

Racing, Wagering and Breeding Law. Under Section 107 of the RWBL, no police officer may hold any office or employment with any firm that is licensed to conduct its business at a racetrack or that owns, leases or manages a racetrack.

Conflicts of Interest under the Public Officers Law. According to Article 4 of the POL, no police officer will: Accept a gift of more than $75 (Refer to rules 2.33, 2.34, 2.35, and 2.36 of the Rules and Regulations for additional limitations). Disclose confidential information learned in the course of official duty to unauthorized persons. (Refer to rules 3.1, 3.2, 3.3, 3.4, and 3.5 of the Rules and Regulations for additional limitations.)

Off Duty Employment. Members of the Department shall not engage directly or indirectly in any other business or employment without the written approval of the Police Commissioner. (Rules and Regulations 2.43 and Manual of Procedure, Article 6.04). Furthermore, any employee wishing to engage in off duty employment will file a CO 8 with the Police Commissioner

# EXHIBIT W

**This Exhibit is a DVD disk (with audio and video)**

**that plays on Windows Media Player**

**The original disk has been supplied to the Court**
**A copy has been served on the plaintiff**

**New Rochelle Police Department**
**Manual of Procedure**

| | | |
|---|---|---|
| Subject: **In-Car Video Cameras** | | |
| Chapter: Two | | Date Effective:    01 Sep 01 |
| Article:   2.11 | Page 1 of 2 | Date Revised: |

**POLICY:** The In-Car Video Systems have proven to be a valuable asset in gathering recorded evidence for the prosecution of criminal and traffic offenses. The In-Car Video equipment shall be used for furthering officer safety, training, assessment of officer performance, and defense of complaints against personnel.

The videotapes identified in this policy are property of the New Rochelle Police Department. Any release, copying, or dissemination of any portion is strictly prohibited without the express written consent of the Commissioner of Police or his designee.

**PROCEDURE:**

1.  General Operating Procedures:

   1.1 The video equipment is the responsibility of the officer assigned to the vehicle, and shall be operated in accordance with the manufacturer's recommendations.

   - At the beginning of a tour, the officer shall speak into the mike and identify himself by stating his name, ID number, vehicle number, time and date.

   - Officers shall not erase or alter the tapes in any manner. Erasing of the tapes will be done at the direction of the Division Commander.

   - Officers shall use only videotapes approved by the Department.

   - In the event of equipment failure or defect, the officer shall document same in his memo book and advise his supervisor.

   1.2 Equipment shall be checked for proper operation at the beginning of each tour. The officer shall ensure that:

   - The video recorder is positioned and adjusted to record events.

   - The video is not deactivated until the enforcement action is completed.

   - The microphone is activated in order to provide the audio recording associated with the video images.

   1.3 To record all Motor Vehicle stops:

   - <u>Routine Traffic Violations:</u> recording shall commence from the point of activating the police vehicle's emergency lights, and continue during the entire stop, concluding as the violator drives away.

   - <u>Suspected DWI:</u> recording shall commence from the point where the officer first suspects erratic driving, and concluding when the suspect is removed from the patrol vehicle in the Sally Port. When safety permits, the field sobriety tests administered by the officer shall be included in the recording.

   - <u>Accident Scene:</u> at the direction of a supervisor, where the recording of a scene will assist in the investigation.

**New Rochelle Police Department**
**Manual of Procedure**

| | | | |
|---|---|---|---|
| Subject: **In-Car Video Cameras** | | | |
| Chapter: Two | | Date Effective: | 01 Sep 01 |
| Article:   2.11 | Page 2 of 2 | Date Revised: | |

1.4 Non-traffic situation:

- Where the use of the recording device will aid in the documentation of an incident

- In the transportation of a member of the opposite sex or a juvenile, the camera shall remain on until the subject is removed from the vehicle.

- In the transportation of unruly, disorderly subjects, the camera shall remain on until the subject is removed from the vehicle.

2   Tape Management:

2.1 Videotapes containing information that may have evidentiary value shall be entered in the Evidence and Property System outlined in Article 9.03 of the Manual of Procedure.

2.2 When tapes need to be replaced or removed from the recorder, a supervisor shall remove the tapes.

2.3 Videotapes removed from vehicles will be marked with the vehicle number, and time and date of removal.

2.4 Videotapes removed and not held as evidence, will be given to the Property Room Clerk for storage.  The tapes will be maintained in the Property Room for not less than 30 days.

2.5 After 30 days, the tapes may be reused, after being completely erased by a designated, qualified person.

3   Supervisory Responsibilities

3.1 Supervisors whose subordinates are operating the in-car systems shall ensure that the officers follow established procedures for the use and maintenance of the video equipment.

3.2 The tapes will be randomly reviewed on a bi-monthly basis to assist in a periodic assessment of officer performance, and to determine whether the video equipment is being properly utilized.  This will also help to identify material that may be appropriate for training.

## Tools for Tolerance

| Officer | Date |
|---|---|
| | |
| Costa | 10/11/05 |
| McGee | 10/11/05 |
| Goldstein | 10/20/05 |
| Johnson | 10/27/05 |
| Williams | 10/27/05 |
| Lore | 11/18/05 |
| Spinner | 11/18/05 |
| Oppedisano | 11/18/05 |
| Ferguson | 11/22/05 |
| Rodriguez, R | 11/22/05 |
| Falcone | 11/22/05 |
| Salerno | 11/22/05 |
| McKnight | 11/22/05 |
| Jackson | 11/30/05 |
| Fudge | 11/30/05 |
| O'Rourke | 11/30/05 |
| Alali | 11/30/05 |
| *Geralis* | 11/30/05 |
| Brandeis | 11/30/05 |



The SWC family of websites
Choose A Site

Search     **TFT Home**    **Law Enforcement**    **Criminal Justice**    **Education**    **Public Sector**

## Law Enforcement Programs

- Command Level
- Community Partnerships
- Cultural Diversity
- Hate Crimes
- Racial Profiling
- Supervising Line Staff
- Classes at the Museum of Tolerance
- Classes at the New York Tolerance Center
- Classes at Your Agency

- Law Enforcement Programs Introduction

## Building Community Trust in a Diverse Post-9/11 Environment

A Class at the New York Tolerance Center

*"It reminds Law Enforcement that there are many dimensions to policing and helps to empower Law Enforcement to police in a diverse society."*
*TFT Participant*

*Building Community Trust in a Diverse Post-9/11 Environment* is an innovative, day-long program that examines the process of trust-building given the new complexities facing the criminal justice system. In a post 9/11 environment, the reality of terrorism has created an imperative for all parts of the system to actively engage in prevention. Prevention requires the vigilance and cooperation of communities. Never before has trust between the community and the criminal justice system been so necessary. By introducing models such a "Dimensions of Trust" and "Spectrum of Tolerance," among others, we look at the nature of trust and how to increase it in a diverse environment.

Training Coordinators: To register your participants please click on the new **Register Online** link below. You may also contact Curran Geist by telephone at (212) 697-1180 or by e-mail with your agencies name, the number of participants, and the dates that you would like to request. It is highly recommended that you register atleast two to three weeks in advance for any program date.

**Travel Reimbursement Policy:** Please note that we can no longer provide travel reimbursement to any participants registering for programs.

Length of Training: 9:00 AM - 4:00 PM
Maximum Seating: 35 per session


Interactive



## REGISTER ONLINE 

**DATES AVAILABLE**

| FEBRUARY 2007 | |
|---|---|
| 20 | Tuesday **FULL** |
| **MARCH 2007** | |
| 6 | Tuesday |
| 28 | Wednesday |
| **APRIL 2007** | |
| 12 | Thursday |

SEND US AN E-MAIL Return to the Class List

Case 7:07-cv-01296-CLB    Document 11-27    Filed 08/02/2007    Page 3 of 5

3/27/2007



## Museum of TOLERANCE®

HOME | VISIT | YOUTH | PROFESSIONALS | EVENTS | ABOUT US | GET INVOLVED | SUPPORT

MUSEUM STORE    BECOME A MEMBER    DONATE NOW

Search | Submit | Select a Site

**Other Locations**

Center for Human
Dignity, Jerusalem

**New York Tolerance
Center**

Sign-up for e-Newsletter

## New York Tolerance Center

The New York Tolerance
Center, in the heart of
Manhattan, is a professional
development multi-media
training facility targeting
educators, law enforcement
officials, and state/local
government practitioners.
Modeled after the successful
Tools for Tolerance Program
at the Museum of Tolerance
in Los Angeles, the Tolerance
Center provides participants
with an intense educational
and experiential daylong
training program. Through
interactive workshops,
exhibits, and videos,
individuals explore issues of
prejudice, diversity, tolerance,
and cooperation in the
workplace and in the
community.

Past and ongoing participants
include the New York and
New Jersey State Police Departments, NYPD, New York City Parks Department,
District Attorney's offices of the Bronx, Brooklyn, Queens and Staten Island,
Grand Central Partnership and various other corporate and Jewish groups



***Please Note:***
The New York Tolerance Center is open to the public on select Mondays on a

reservation-only basis. Please call for dates and times.
Admission:
Adults....................$20.00
Students and Seniors.......$15.00

For further information please call 212/697-1180.

Use this link for more information about the New York Office of the Simon Wiesenthal Center.

The New York Tolerance Center is available for special events. **Please call the Simon Wiesenthal Center's New York office at 212-370-0320.**

The New York Tolerance Center is seeking volunteer docents to assist in communicating our message by leading tours and other opportunities. We are asking for a minimum commitment of 16 hours (2 days) per month, in addition to completing required training.

Please fill out the Volunteer Application Form and return it to:
Karen Shulman via fax at 212/697-1314 or via e-mail
kshulman@tolerancecenter.org

**STAFF:**

**Bridget Regan, J.D., Director**
bregan@tolerancecenter.org

**Curran Geist, Project Coordinator**
cgeist@tolerancecenter.org

**Karen Shulman, Project Coordinator**
kshulman@tolerancecenter.org

**Ian Lipner, Technical Contact**
ilipner@tolerancecenter.com

**Anne Godlewski, Administrative Coordinator**

agodlewski@tolerancecenter.org

**For more information on the New York Tolerance Center,
click here.**
*(Adobe Acrobat required)*



Adobe Acrobat Reader required

© Copyright 2006, Museum of Tolerance, 9786 W. Pico Blvd, Los Angeles, California 90035

# *The Post Patrol Book*



Revised March 2002

New Rochelle Police Department
Training Unit
Lt. Cosmo Costa, Training Director
Do not reproduce without the permission of the Training Unit

New Rochelle Police Department

# The Post Patrol Guide

The post patrol guide is intended to provide the patrol officer and supervisor with information regarding the location and designation of posts, throughout the City, as well providing information concerning the staffing of those posts.

The territory within the police jurisdiction of the City of New Rochelle is divided into Posts designated as **Sectors and Beats and Foot Posts.**

There are nine established Sectors and eleven established Beats. Foot Posts are situated within each established Beat.

**Sectors** are established for the purpose of defining patrol area responsibilities.

**Beats** are established for the purpose of defining structured community policing responsibilities.

**Foot Posts** are established for the purpose of defining areas of special attention, within the Beats.

Additional posts may be temporarily created as the need arises.

1

New Rochelle Police Department

# Post Patrol
# General Information

1.  The explanation hereafter used for Tours of Duty is as follows:

**First Tour of Duty**

> 12 Midnight to 8:00 a.m.    (0001 – 0800 hrs.)

**Second Tour of Duty**

> 8:00 a.m. to 4:00 p.m.    (0800 – 1600 hrs.)

**Third Tour of Duty**

> 4:00 p.m. to 12 Midnight    (1600 – 2400 hrs.)

2.  Personnel assigned to sector, beat, post or foot post patrol will confine their non-directed patrol activities to their assigned sector, beat or foot post.

3.  Personnel assigned to foot post will confine their patrol to that area and will be responsible for all conditions requiring police attention on their post during their tour of duty. Officers assigned to a foot post will contact headquarters, every thirty minutes with his or her location. The officer should contact headquarters from a pay phone using 911.  If a pay phone is unavailable, the officer should contact headquarters by radio.

4.  Officers going on meal period or out of service for any reason will notify Headquarters via radio. Officers out of service for traffic violators will notify headquarters and give the location and license plate of vehicle stopped, prior to exiting their patrol vehicle.

5.  The time allowed for meal period is 30 minutes and is regulated by work sheet.

6.  Police officers will take their meal period on their assigned sector, beat, post or foot post *whenever* possible.  There is no extension of the meal period for police officers assigned to patrol sectors.

7.  When assigned to a fixed post for the entire tour, the meal period will be 60 minutes.

2

New Rochelle Police Department

8.  When manpower shortages or other circumstances alter established post patrols and result in the merging of posts, the assigned officer will secure permission from the desk officer as to the time the officer is to take his or her meal period. The officer will notify headquarters upon resuming duty after the meal period.

9.  In the event that an officer is delayed for a legitimate police purpose from taking his or her assigned meal period, the officer will notify the desk officer and request that another meal period be assigned. The desk officer will note any change of meal periods on the PD-59 (Daily Work Sheet).

10. When houses are listed on the House Inspection Form (PD 41), they will be listed as "dark" houses. A "dark" house is one that is unoccupied for a period of time and the owner or person responsible gives notice to the Department. Whenever the inspection of any door or window of any building is rendered impossible or impractical by reason of a fence or other obstacles, an entry to this effect will be made in the Memo Book (PD 84A) of the inspecting officer. When in doubt as to an inspection, notify the patrol supervisor immediately.

11. It shall be the duty of members of the Second and Third tours to make inspections of "dark" houses, making at least one inspection in each 24-hour period. It shall be the duty of all Second tour personnel to notify their Third tour relief at the change of tours of all "dark" houses that were not inspected during their respective tour of duty.

12. Police Officers on sector and beats will include as part of their patrol all municipal parking lots and garages. Additionally, officers will make frequent inspections of the exterior of all commercial establishments, public buildings and schools. The inspections of all such building and facilities will include the front, sides and rear where physically practical. Furthermore, Sector Four and Beat One will patrol the interior of the railroad station. Sector Two and Beat One will patrol the interior of the library. The time devoted to patrolling the interior of the above locations shall not exceed ten minutes unless circumstances dictate more time is necessary. Officers assigned to sector patrol will notify the police dispatcher when patrolling the interior of the railroad station or the public library.

13. If a door, window, transom, gate or grating is found open or unlocked, an inspection will be made of the premise and headquarters will be notified of the condition. A patrol supervisor will be dispatched to the location of the open or unlocked door, window, transom, gate or grating. The officer will be guided by the orders of the patrol supervisor.

14. Police Officers assigned to Sector patrol will be **entirely** responsible for all conditions on their sector requiring police attention, such as house inspections, court process service, police radio calls and all police duty as specified in the Rules and Regulations and Manual of Procedure.

3

New Rochelle Police Department

15. Upon being relieved at the expiration of a tour of duty, all officers will advise their relief of all unusual police conditions existing on their respective sectors, such as inspections they were unable to complete, hazardous conditions, etc., together with all other pertinent information they may possess. Police officers assigned to Foot Posts will forward to their relief all information of an emergency nature. If information of an emergency nature exists, on a Foot Post and there is no relief, the information will be provided to the desk officer.

16. At the beginning of each tour of duty, all officers will seek and obtain all such information from the officers they relieve.

17. All members of the Department assigned to school crossings, church crossings or other fixed traffic posts will, on arriving at their crossings, advise headquarters and then stand in the street in the best position to safeguard the children and pedestrians crossing the street.

18. Police officers assigned to school crossing or thoroughfares where the traffic light control system is in operation will regulate traffic in compliance with the traffic light signals. Police officers will not unnecessarily stop traffic contrary to the traffic control lights in order to allow school children or pedestrians across the roadway.

19. The provisions of the City Code permit police officers to disregard any traffic light signal or posted sign in order to expedite the movement of traffic or safeguard pedestrians or property; however, this provision should not be invoked by police officers assigned to school crossings when no emergency exists.

20. When directing traffic, traffic officers will take up a safe, visible position in the middle of the intersection or as near thereto as possible and shall direct traffic by using both hand signals and the whistle. These directions shall be delivered in a calm and deliberate manner. Rapid hand movements, excessive whistle blowing and verbal directions will be avoided. Traffic officers should remain vigilante, at all times, for vehicular and pedestrian traffic.

21. When assigned to a traffic post the traffic officer will be equipped with:

   a) Whistle
   b) White gloves
   c) Traffic vest
   d) Flashlight, if assigned at night

   Additionally, when the traffic officer is wearing a raincoat, he or she will wear it orange side out.

22. Foot posts will be patrolled in a manner so as to direct attention to the problem areas of the post. Foot posts will be patrolled in the above manner unless the officer is directed to patrol the post in a specific manner by a patrol supervisor.

4

New Rochelle Police Department

# BEAT BOUNDARIES

## BEAT 7

First Street to Washington Avenue to Webster Avenue on
the west;
Lockwood Avenue on the north;
Division Street on the east;
Interstate 95 on the south.

## FOOT POST 7
**Shall include all the territory bounded as follows:**

On the north - Washington Avenue from 1st Street to
Warren Street;
On the east - Warren Street to Grove Avenue;
On the south - Grove Avenue to Jones Street to 1st Street;
On the west - 1st Street.

**Foot Post 7 should be patrolled according to the conditions,
which may require attention on the post.**

30

New Rochelle Police Department



**BEAT SEVEN**

31

New Rochelle Police Department

# **BEAT BOUNDARIES**

## BEAT 8

City line with the Town of Pelham to Feeney Park on the west;
Lockwood Avenue to Fourth Street to Washington Avenue on
the north;
First Street on the east;
Railroad tracks on the south.

## FOOT POST 8
### Shall include all territory bounded as follows:

On the north - Washington Avenue 6th Street to 2nd Street;
On the east - 2nd Street to Union Avenue;
On the south - Union Avenue to 6th Street;
On the west - 6th Street (post shall include Feeney Park).

**Foot Post 8 should be patrolled according to the conditions, which may require attention on the post.**

32

New Rochelle Police Department



**BEAT EIGHT**

# AGREEMENT

## BETWEEN

## THE CITY OF NEW ROCHELLE

## AND

## POLICE ASSOCIATION OF NEW ROCHELLE, N.Y., INC.

**Effective January 1, 2005**

# AGREEMENT

### Between

### The City of New Rochelle

### And

### Police Association of New Rochelle, NY. Inc.

### Effective January 1, 2005

ARTICLE I - SCOPE OF AGREEMENT ................................................................................... 1
    1. Identity of the Parties ......................................................................................... 1
    2. Endorsement of Principles .................................................................................. 1
    3. Statutory Limitations ......................................................................................... 1
    4. Intent of the Agreement ..................................................................................... 1
    5. Termination and Modification ............................................................................ 1
    6. Identity of Officers............................................................................................. 1
    7. Pledge Against Discrimination and Coercion. .................................................... 2
    8. Employees to Receive Copies of Agreement ...................................................... 2

ARTICLE II - UNION RIGHTS ............................................................................................. 2
    1. Union Recognition (Bargaining Unit).................................................................. 2
    2. Union Membership and Dues Checkoff................................................................ 2
    3. Notification of Personnel Changes ...................................................................... 3
    4. Union Activity During Working Hours ................................................................ 3
    5. Union Investigation of Grievances During Working Hours ................................... 3
    6. Union Attendance at Official Meetings with Management...................................... 3
    7. Union Activity .................................................................................................... 3
    8. Leaves to Attend Union Conventions or Functions. ............................................. 3
    9. Bulletin Boards ................................................................................................. 3
    10.Office Space. .................................................................................................... 3
    11.No Strike........................................................................................................... 3
    12.Union Use of Police Vehicles at Funerals........................................................... 3
    13.Notification to Union (Legislation)...................................................................... 3
    14.Payroll Deductions............................................................................................. 4
    15.Vending Machines.............................................................................................. 4

ARTICLE III - MANAGEMENT RIGHTS ............................................................................... 4
    1.Fundamental Employer Rights............................................................................. 4
    2.Rules and Regulations ........................................................................................ 4
    3.No Lock-out Provision......................................................................................... 4

ARTICLE IV - WORK WEEK ............................................................................................... 4
    1.Work Week and Tours of Duty............................................................................ 4

ARTICLE V - COMPENSATION ........................................................................................... 5
    1.Annual Salaries.................................................................................................. 5
    2.Longevity........................................................................................................... 6
    3.Detective Compensation ..................................................................................... 6

4.Field Training Officer (FTO)................................................................ ......6

ARTICLE VI - OVERTIME ........................................................ 6

ARTICLE VII - LEAVES ........................................................ 7
    1.Holidays................................................................7&8
    2.Vacation ........................................................ 8
    3.Special Severance Vacation Leave Pay........................................................ 8
    4.Personal Leave ........................................................ 9
    5.Death Leave ........................................................ 9
    6.Sick Leave ........................................................ 9
    7.Compassionate Leave ........................................................ 9
    8.Maternity Leave........................................................ 10

ARTICLE VIII - PENSIONS ........................................................ 10
    1.Retirement Options........................................................ 10

ARTICLE IX - HOSPITALIZATION, SURGICAL, MAJOR MEDICAL INSURANCE AND DEATH
    BENEFITS ........................................................ 11
    1.Health Insurance ........................................................ 101
    2.Retirees Coverage ........................................................ 11
    3.Health Insurance Coverage for Suspended Employees........................................................ 11
    4.Health Insurance Coverage for Eligible Dependents and Employees Killed in the Line of Duty 11
    5.Funeral Expenses ........................................................ 11
    6.Sick Leave (Exhaustion)........................................................ 11
    7.Guaranteed Ordinary Death Benefit ........................................................ 11
    8.Welfare Fund ........................................................ 11

ARTICLE X - GENERAL PROVISIONS ........................................................ 12
    1.Probationary Appointments ........................................................ 12
    2.Uniform and Cleaning Allowance ........................................................ 12
    3.Radio Motor Patrol Cars (Repair) ........................................................ 12
    4.Mileage Allowance (Outside City) ........................................................ 12
    5.Personal Items (Compensation for Loss) ........................................................ 12
    6.Polygraph........................................................ 12
    7.Separation from Service (Cash Payment Entitlement)........................................................ 12
    8.Squad Room (Improvement in Facilities) ........................................................ 12
    9.Standby ........................................................ 12
    10.Subpoena Fees (Special Compensation After Separation from Service) ........................................................ 12
    11.Tuition Reimbursement ........................................................ 13

ARTICLE XI - SETTLEMENT OF DISPUTES........................................................ 13
    1.Scope and Intent ........................................................ 13
    2.First Stage ........................................................ 13
    3.Second Stage........................................................ 13
    4.Third Stage ........................................................ 14
    5.Group Grievances ........................................................ 14
    6.Arbitration................................................................14
    7. Binding Arbitration ........................................................14&15

1.    Probationary Appointments.  The UNION and the EMPLOYER agree that a probationary appointment to the Police Department is deemed to be a trial period, the term of which is set forth in the Civil Service Rules; the parties further agree that while a probationary appointee is entitled to all the economic benefits and terms of this AGREEMENT, such appointee is, nevertheless, subject to discharge from the Department by the EMPLOYER for any reason deemed sufficient by the EMPLOYER and such discharge, if it occurs, shall not be subject to the grievance procedure hereafter established under Article XI.

2.    Uniform and Cleaning Allowance.  The annual uniform and cleaning allowance payable in January to each employee in the bargaining unit is $775 for 2005, $800 for 2006, $825 for 2007, $850 for 2008 and $900 for 2009.

A uniform and cleaning allowance of seven hundred fifty ($750.00) dollars shall be paid to a new employee upon the completion of his probationary appointment retroactive to the date upon which he first became a probationary appointee of the Police Department.  At the beginning of the next calendar year of his service as a permanent appointee of the Police Department, he shall receive a pro-rata share of the regular uniform and cleaning allowance as all other employees presently in the bargaining unit and on the same basis as set forth above; said pro-rata share shall be computed on the basis of the number of calendar days actually worked during the preceding year; thereafter he shall receive the full annual allowance as set forth in the first paragraph above.

3.    Radio Motor Patrol Cars (Repair).  If it becomes necessary to change a flat tire on a police vehicle, the employee shall have the right to call the Duty Tow Service when the municipal garage is closed.

4.    Mileage Allowance (Outside City).  A member of the Police Association who, with the prior authorization of the member's supervisor, uses his\her personal vehicle for travel outside the City of New Rochelle in the course of, or connected with his\her employment, shall receive a mileage allowance equal to the then prevailing rate established by the Internal Revenue Service computed on the roundtrip distance from headquarters to the place traveled.

5.    Personal Items (Compensation for Loss).  An employee shall be compensated for the loss and damage of personal items, excluding automobiles, in the course of a police action to a maximum of seventy-five ($75.00) dollars per incident.

6.    Polygraph.  An employee may not be ordered to take a polygraph test.

7.    Separation from Service (Cash Payment Entitlement).  An employee, whose services are terminated for any reason except cause, or his legal representative in the event of death, shall be entitled to and shall within thirty (30) days, receive the cash payment of the monetary value of all benefits to which he has become entitled.

8.    Squad room (Improvement in Facilities).  There shall be an increased number of chairs and a pay phone installed in the squad room in police headquarters.

9.    Standby.  An employee who is ordered to be on standby shall be given one (1) hour compensatory time for every two (2) hours he actually remains on standby.  Compensatory time for standby shall be pro-rated.  For purposes of this section, standby is time that an employee is not actually on duty but is continuously available to report to duty within one (1) hour of receiving notification, and the employee is required to insure his availability by furnishing to the Commissioner of Police or his designee a place where he may be so notified.

10.    Subpoena Fees (Special Compensation After Separation from Service).  A member, whose services are terminated for any reason except cause, who is called to testify in criminal or civil cases or administrative hearings that he investigated or in which he was involved in his official

capacity prior to the termination of his services, shall be compensated for such appearances for a day's pay at the appropriate daily rate with the same compensation as the present rate for the rank he held at separation from service.

11.    Tuition Reimbursement.  The Police Commissioner may approve either partial or full reimbursement by the EMPLOYER of tuition for courses taken by unit members under the following circumstances:

A.    The unit member must have completed his/her probationary period with the Police Department.

B.    Courses for which tuition reimbursement is sought must be credited toward an undergraduate or graduate degree in Criminal Justice or Public Administration and must be approved in advance by the Police Commissioner.

C.    The Police Commissioner may set standards and limits for minimum grades that must be achieved and maximum course costs for reimbursement.

D.    The unit member must successfully complete a course prior to filing for actual reimbursement.

E.    When filing for reimbursement, the unit member shall submit such proof of course cost, content and grade received as required by the Police Commissioner.

F.    A unit member who resigns, retires or otherwise terminates employment with the City of New Rochelle shall reimburse the City for tuition payment made to him/her for courses completed within one year prior to such resignation, retirement, or other termination of employment. The City reserves the right to withhold such tuition reimbursement from any payments which are due the unit member upon a separation from the employ of the City.

G.    The total amount of City tuition reimbursement that may be approved for the unit membership as a whole shall not exceed $30,000 for 2005 and $40,000 per year effective 2006.

## ARTICLE XI - SETTLEMENT OF DISPUTES

1.    Scope and Intent.  In the event of a dispute or a grievance between the EMPLOYER and the UNION or any employee represented by the UNION, representatives of the EMPLOYER and the UNION shall make an honest and sincere effort to adjust the same in an amicable manner. Failing such adjustment, the dispute settlement procedure as described in this Article of the AGREEMENT shall be followed.

This procedure shall be used in seeking the settlement of any grievance or dispute which may arise between the parties, including the application, interpretation or enforcement of this AGREEMENT. However, matters shall not be handled under this procedure involving alteration of wage rate schedules, retirement benefits established elsewhere in this AGREEMENT, or of established budget appropriations or personnel authorizations.

The time limits in the grievance procedure may be extended by mutual agreement in writing.

Any step of the grievance procedure may be bypassed by mutual agreement, in writing.

2.    First Stage.  The grievance shall be presented, in writing, by the employee or the UNION to the Commissioner of Police within twenty (20) work days of its occurrence. The Commissioner of Police or his/her designee shall issue his/her response to the grievant, in writing, within thirteen (13) work days after the presentation of the grievance to him/her.

3.    Second Stage.  If the grievance is not settled at the first stage, it shall be presented by the UNION to the EMPLOYER'S Director of Personnel, in writing, within fifteen (15) work days after the response of the Commissioner of Police is due. The Director of Personnel shall act upon the grievance within fifteen (15) work days after his/her receipt of the matter in the form of a written response to the UNION with copies to the City Manager, the Commissioner of Police and the employee.

13

4.    Arbitration.  Grievances which have not been settled through the third stage shall be referred to binding arbitration if either party serves written notice on the other requesting arbitration. Such notice shall be filed within thirty (30) work days after the decision of the Director of Personnel is due.

5.    Binding Arbitration.  If the grievance to be settled involves issues directly related to the interpretation, application or enforcement of the provisions of this AGREEMENT, it shall be referred to binding arbitration. However, the following shall not be subject or submitted to binding arbitration: provisions of the AGREEMENT which relate to or in any manner affect the obligations of the EMPLOYER as intended by State statute or City Charter; any matter which is covered by State statute relating to the operation and jurisdiction of the Municipal Civil Service Commission, including rules which the Commission is authorized to promulgate; the elimination or discontinuance of any job.

Binding arbitration shall be conducted by an arbitrator to be selected by the EMPLOYER and the UNION after notice has been given by either party of intention to proceed to binding arbitration. The arbitrator shall be selected from a panel of impartial arbitrators furnished by the New York State Public Employment Relations Board.

No issue whatsoever shall be arbitrated or subject to arbitration unless such issue results from an action or occurrence which takes place following the effective date of this AGREEMENT, and no arbitration determination or award shall be made by an arbitrator which grants any right or relief for any period of time whatsoever prior to the effective date of this AGREEMENT. In the event that this AGREEMENT is terminated or breached for any reason, rights to arbitration thereupon cease. This provision, however, shall not affect any arbitration proceedings which were properly commenced prior to the expiration date or termination of this AGREEMENT.

No award of any arbitrator may be retro-active to a date which is earlier than thirty (30) working days prior to the filing of the grievance.

The arbitrator shall have initial authority to determine whether or not the dispute is arbitrable under the expressed terms of this AGREEMENT. Once it is determined that a dispute is arbitrable, the arbitrator shall proceed in accordance with this Article to determine the merits of the disputes submitted to arbitration.

The arbitrator shall neither add to, detract from nor modify the language of this AGREEMENT in arriving at a determination of any issue presented that is proper for arbitration within the limitations expressed. The arbitrator shall have no authority to grant wage increases or wage decreases, or to grant increases or decreases in personnel.

The arbitrator shall expressly confine himself to the precise issue submitted for arbitration and shall have no authority to determine any other issue not so submitted to him, or to submit observations or declarations of opinion which are not directly essential in reaching the determination.

Expenses for the arbitrator's services and the proceedings shall be borne equally by the EMPLOYER and the UNION. However, each party shall be responsible for compensating its own representatives and witnesses. If either party desires a verbatim record of the proceedings, it may cause such a record to be made, provided it pays for the record and makes copies available without charge to the other party.

**APPROVED AS TO FORM:**

_____                          _____
Corporation Counsel                                          Date     11/14/05

**FOR THE CITY OF NEW ROCHELLE:**          **FOR THE POLICE ASSOCIATION OF NEW ROCHELLE, N.Y., INC.:**

_____                          _____
City Manager                                                  President

_____                          _____

15

93/15/2007 08:50 FAX 914 6542345        TCNR LAW              → MEISELS PETER        Ø004

914 6542345

## CHARGE OF DISCRIMINATION

| | ENTER CHARGE NUMBER |
|---|---|
| | ☐ FEPA  ☒ EEOC |

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form

520-2007-01727

NEW YORK STATE DIVISION OF HUMAN RIGHTS _____ and EEOC
*(State or local Agency, if any)*

| NAME *(Indicate Mr.,)*   DOB: 06/17/72 | HOME TELEPHONE NO. *(Include Area Code)* |
|---|---|
| Mr. Araz Alali        ss#: 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 | 914-738-0909 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 703 Pelham Road, Unit 514, New Rochelle, New York 10805 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| City of New Rochelle | 500+- | 914-654-2227 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | |
|---|---|
| 475 North Avenue, New Rochelle, New York | |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| N/A        FEB 1 6 2007 | |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | |
|---|---|
| EEC. | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE *(Month, day, year)* |
|---|---|
| ☒ RACE    ☒ COLOR    SEX    ☐ RELIGION    ☒ NATIONAL ORIGIN  age    RETALIATION    OTHER | February 12, 2007 |

I am a male of Iraqi national origin and am employed as a Police Officer in the Respondent City of New Rochelle, New York. I am the only sworn member of the Department who is of Middle Eastern descent; and I believe I am the first such individual ever to be employed by the Respondent in its Police Department. Since virtually the commencement of my employment with Respondent I have been: targeted for disparate treatment (referred to as "Ali Baba", "terrorist", and *inter alia* "Ali"); denied specialized training which is routinely given to less senior officers; repeatedly false accused of wrong-doing; targeted for retaliation for conduct engaged in with complete impunity by other members of the Police Department; repeatedly given job performance evaluations falsely characterizing my work as "below standard" when in fact my job performance is above standard; repeatedly "investigated" on admittedly false/frivolous civilian complaints; punitively assigned to exclusively issue traffic tickets for double parked vehicles and operators of motor vehicles who make U-turns on North Avenue in the City of New Rochelle; punitively assigned to work as a dispatcher - - an assignment no other Police Officer has had given the employment by the Respondent of civilian dispatchers; forbidden to operate a police vehicle; assigned foot patrol on midnight tours of duty - - an otherwise non-existent assignment - - in snow and rainy conditions. Since the only conceivable motive for this disparate treatment is my race, national origin and/or ethnicity I charge Respondent with violating my rights under Title VII.

| X I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY-(When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| *[signature]*  SIGNATURE OF COMPLAINANT | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month and year)* |
| Araz Alali, 2/12/07 |  |

MAR 15 2007 ⌐ 8:16 04

DEFENDANT'S EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

ARAZ ALALI,

                    Plaintiff,

        -against-

ROBERT GAZZOLA, individually,
PATRICK J. CARROLL, individually,
and the CITY OF NEW ROCHELLE,
New York,

                  Defendants.

-----------------------------------------------------x

07 Civ.

**COMPLAINT**

07 CIV. 1296

Jury Trial Demanded

BRIEANT

**RECEIVED**
FEB 21 2007
USDC-WP-SDNY

      Plaintiff ARAZ ALALI, by his attorneys Lovett & Gould, LLP, for his complaint respectfully states:

## NATURE OF THE ACTION

      1. This is an action for compensatory and punitive damages, proximately resulting from the conduct of the Defendants engaged in jointly and under color of the laws of the State of New York, for violations of Plaintiff's rights as guaranteed by 42 U.S.C. §2000e *et. seq*, 42 U.S.C. §1981, and 42 U.S.C. §1983.

## JURISDICTION

      2. Plaintiff's federal civil rights claims (including a Title VII retaliation claim), as set forth *infra*, are interposed in accordance with 28 U.S.C. §§1331, 1343. Plaintiff's state law claim is made pursuant to 28 U.S.C. §1367. Plaintiff's underlying Title VII claim is the subject of a Charge of Discrimination presently pending before the United States



Equal Employment Opportunity Commission. At such time as the EEOC issues a Notice of Right to Sue Plaintiff will seek leave of the Court to amend this complaint.

## THE PARTIES

3. Plaintiff ARAZ ALALI is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was employed as a Police Officer by the City of New Rochelle, New York, having previously been employed as such by *inter alia* the City of New York. Plaintiff is of Iraqi national origin and as such is the only Police Officer of Middle Eastern descent who has ever been employed by the City of New Rochelle (hereinafter alternatively the "City").

4. Defendant ROBERT GAZZOLA (hereinafter "Gazzola"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as a Police Captain by the City. By reason of the departmental chain of command Gazzola has direct supervisory authority over Plaintiff.

5. Defendant PATRICK J. CARROLL (hereinafter "Carroll"), who is sued in his individual and personal capacities only, at all times relevant to this complaint was employed as the Commissioner of Police by the City.

6. Defendant CITY OF NEW ROCHELLE, New York (hereinafter "City), is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State of New York.

2

## THE FACTS

7. Commencing almost immediately following Plaintiff's February 2002 transfer to the City's Police Department, and continuing to date, he has been systematically and deliberately subjected to discriminatory and disparate treatment by reason of his national origin, ethnicity and/or color.

8. In that connection Plaintiff has, to Defendants' knowledge and/or at their direction and/or with their active encouragement and condonation, been:

a. Repeatedly been addressed as: "terrorist"; "Ali Baba", "Camel Jockey" and *inter alia*, "Ali",

b. Repeatedly been denied any meaningful specialized training, which training is routinely provided by Defendants to Police Officers junior to Plaintiff in seniority,

c. Forced to attend a seminar concerning "Tools for Tolerance Post 911", which assignment was calculated by Defendants to humiliate and embarrass Plaintiff since he alone has been the departmental target of systemic intolerance by reason of his ethnicity,

d. Systematically been given calculatedly false "below standard" job performance evaluations (when in fact his job performance has consistently been above average), replete with fabrications and/or falsehoods, which evaluations have served as Defendants' predicate for barring Plaintiff from working on an overtime basis - - thus causing him substantial pecuniary losses,

3

d. Assigned for months at a time as a "dispatcher" in the Police Department's Communications Room - - even though the dispatcher function is civilian in nature and otherwise performed by non-police employees of the Department,

e. Forced to work walking posts during a midnight to 8:00 a.m. tour of duty, in heavy rain and/or snow, when there otherwise is no walking post assigned on such a shift,

f. Forbidden, for substantial periods of time, to operate a police vehicle,

g. Forbidden, for substantial periods of time, to interact with members of the public while on duty,

h. Prohibited, by reason of the false "below standard" job performance evaluations, to engage in so-called "mutual switches" of job duty assignments with other sworn members of the Police Department,

i. Subjected repeatedly to "investigations" of supposed wrong doing under circumstances where no wrong doing occurred and Defendants knew that no wrong doing had occurred, and,

j. For substantial periods of time being restricted to issuing parking tickets on one street in the City for the purpose of humiliating and degrading him.

9. As a result of the discriminatory treatment accorded him, Plaintiff has on occasion non-disruptively expressed to Defendants his concerns and in that connection:

a. On January 7, 2007, advised Carroll that he was the subject of "[p]ersecution based on heritage" and that he was the subject of retaliatory actions "solely based upon [his] middle-eastern heritage", and, *inter alia,*

4

b. On February 2, 2007, advised Gazzola in a rebuttal to one of many calculated false "below standard" job performance evaluations: "I am being singled out due to my heritage. Being the sole middle-eastern police officer has been hopeless".

10. As a proximate result of Plaintiff's expressions of concern as evidenced by the preceding paragraph "9", Defendants agreed to punish him by denying Plaintiff tuition reimbursement in the amount of $10,180 which was payable to Iona College for courses taken by Plaintiff in accordance with police departmental policy.

11. By reason of the continuing discriminatory treatment afforded him and the retaliation imposed because he expressed his opposition to that treatment, on February 12, 2007, Plaintiff duly filed a Charge of Discrimination ("race", "color" and "national origin") with the EEOC.

12. Also on February 12, 2007, Plaintiff through counsel notified Defendants by fax of the EEOC filing and cautioned that "any retaliation causally the result of that filing is independently actionable in Federal Court for damages".

13. Aware of Plaintiff's EEOC filing, Defendants again agreed to retaliate against Plaintiff, this time by serving him on February 15, 2007, with a series of frivolous disciplinary charges for the stated objective of penalizing him through the forfeiture of one month's salary. By way of contrast certain other members of the Police Department and personnel employed in the City's Court, who are known to Defendants to have committed both felonies and misdemeanors, have not been subjected to similar disciplinary action - - much less arrest/prosecution.

14. By reason of Defendants' intentional discriminatory treatment of Plaintiff

he has been: caused substantial pecuniary damages; publicly embarrassed; publicly

humiliated; rendered anxious; caused emotional upset; suffered a gross impairment of his

professional career; publicly degraded; and otherwise been rendered sick and sore.


## AS AND FOR A FIRST CLAIM

15. Repeats and realleges as if fully set forth the allegations of fact contained in

paragraphs "1" to "14", inclusive.

16. Under the premises Defendants' conduct violated Plaintiff's rights as

guaranteed by 42 U.S.C. §1981.


## AS AND FOR A SECOND CLAIM

17. Repeats and realleges as if fully set forth the allegations of fact contained in

paragraphs "1" to "14", inclusive.

18. Under the premises Defendants' conduct violated Plaintiff's right to Equal

Protection as guaranteed by reason of the Fourteenth Amendment to the United States

Constitution, 42 U.S.C. §1983.


## AS AND FOR A THIRD CLAIM

19. Repeats and realleges as if fully set forth the allegations of fact contained in

paragraphs "1" to "14", inclusive.

20. Under the premises the prosecution of the retaliatory disciplinary charges

constitutes a selective prosecution violative of Plaintiff's rights as guaranteed by 42

U.S.C. §1983.

## AS AND FOR A FOURTH CLAIM

21. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "14", inclusive.

22. Under the premises the retaliatory prosecution of the disciplinary charges violates Plaintiff's rights as guaranteed by 42 U.S.C. §2000e *et seq.*

## AS AND FOR A FIFTH CLAIM

23. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "14", inclusive.

24. Under the premises the City's conduct as Plaintiff's employer, and Gazzola and Carroll's conduct as aiders and abettors, violated Plaintiff's rights as guaranteed by Section 296 *et. seq* of the New York State Executive Law.

WHEREFORE a judgment is respectfully demanded:

    a. Awarding against Gazzola and Carroll on the First, Second, Third and Fourth Claims such punitive damages as the jury may determine,

    b. Awarding against all Defendants on the First, Second, Third and Fourth Claims such compensatory damages as the jury may determine,

    c. Awarding as against all Defendants on the First, Second, Third and Fourth Claims reasonable attorney's fees and costs,

    d. Awarding on the Fifth Claim such compensatory damages as the jury may determine, and,

e.  Granting such other and further relief as to the Court seems just and

proper.

Dated: White Plains, N.Y.
        February 17, 2007

LOVETT & GOULD, LLP
By:_____
        Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Attorneys for Defendants
3 Gannett Drive
White Plains, NY 10604
(914) 323-7000
Attn:  Peter A. Meisels (PM-5018)
        Lalit Loomba (LL-9755)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x    07 Civ. 1296(CLB)
ARAZ ALALI,

                              Plaintiff,

        -against-                                          **ANSWER**

ROBERT GAZZOLA, individually, PATRICK J.
CARROLL, individually, and the CITY OF NEW
ROCHELLE, New York,

                              Defendants.
---------------------------------------------------------------x

        Defendants Robert Gazzola, Patrick J. Carroll and the City of New Rochelle, by

their attorneys Wilson, Elser, Moskowitz, Edelman & Dicker LLP, for their answer, state

as follows:

        1.      Deny knowledge or information sufficient to form a belief as to the truth

of the allegations included in ¶ 1 of the complaint.

        2.      Deny knowledge or information sufficient to form a belief as to the truth

of the allegations included in ¶ 2 of the complaint.

        3.      Deny knowledge or information sufficient to form a belief as to the truth

of the allegations included in ¶ 3 of the complaint, except admit that Araz Alali is

employed as a Police Officer by the City of New Rochelle.

4.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations included in ¶ 5 of the complaint, except admit that Robert Gazzola is employed as a Captain by the City of New Rochelle and denies that he has direct supervisory authority over plaintiff.

5.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations included in ¶ 5 of the complaint, except admit that Patrick J. Carroll is the Commissioner of the Police of the City of New Rochelle.

6.    Deny the truth of the allegations included in ¶ 6 of the complaint, except admit that the City of New Rochelle is a municipal corporation existing pursuant to the laws of the state of New York.

7.    Deny the truth of the allegations included in ¶ 7 of the complaint.

8.    Deny the truth of the allegations included in ¶ 8 of the complaint, including its various subdivisions (a) through (j).

9.    Deny the truth of the allegations included in ¶ 9 of the complaint, including its various subdivisions (a) and (b).

10.    Deny the truth of the allegations included in ¶ 10 of the complaint.

11.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations included in ¶ 11 of the complaint.

12.    Deny the truth of the allegations included in ¶ 12 of the complaint, except admit that plaintiff's counsel faxed correspondence to the City of New Rochelle regarding a complaint filed with the EEOC and refers the Court to the document itself for its contents.

13.    Deny the truth of the allegations included in ¶ 13 of the complaint.

2

14.    Deny the truth of the allegations included in ¶ 14 of the complaint.

15.    Repeat and reallege the responses set forth in ¶¶ 1 through 14 above.

16.    Deny the allegations included in ¶ 16 of the complaint and respectfully refer all questions of law to the Court.

17.    Repeat and reallege the responses set forth in ¶¶ 1 through 16 above.

18.    Deny the truth of the allegations included in ¶ 18 of the complaint and respectfully refer all questions of law to the Court.

19.    Repeat and reallege the responses set forth in ¶¶ 1 through 18 above.

20.    Deny the truth of the allegations included in ¶ 20 of the complaint, and respectfully refer all questions of law to the Court.

21.    Repeat and reallege the responses set forth in ¶¶ 1 through 20 above.

22.    Deny the truth of the allegations contained in ¶ 22 of the complaint, and respectfully refer all questions of law to the Court.

23.    Repeat and reallege the response set forth in ¶¶ 1 through 22 above.

24.    Deny the truth of the allegations included in ¶ 24 of the complaint and respectfully refer all questions of law to the Court.

## AS AND FOR A FIRST
## AFFIRMATIVE DEFENSE

25.    Plaintiff fails to state a claim for which the Court may grant relief against the defendants.

## AS AND FOR A SECOND
## AFFIRMATIVE DEFENSE

26.    Plaintiff failed to exhaust his administrative remedies.

3

## AS AND FOR A THIRD
## AFFIRMATIVE DEFENSE

27.     Defendant Robert Gazzola is protected by the doctrine of absolute

immunity.

## AS AND FOR A FOURTH
## AFFIRMATIVE DEFENSE

28.     Defendant Robert Gazzola is protected by the doctrine of qualified

immunity.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE

29.     Defendant Patrick J. Carroll is protected by the doctrine of absolute

immunity.

## AS AND FOR A SIXTH
## AFFIRMATIVE DEFENSE

30.     Defendant Patrick J. Carroll is protected by the doctrine of qualified

immunity.

## AS AND FOR A SEVENTH
## AFFIRMATIVE DEFENSE

31.     Plaintiff's claims are time-barred.

## AS AND FOR AN EIGTH
## AFFIRMATIVE DEFENSE

32.     Any state law claims are barred by plaintiff's failure to serve a timely

notice of claim.

4

1535281.1

## AS AND FOR A NINTH
## AFFIRMATIVE DEFENSE

33.    Any actions taken in reference to the plaintiff were not taken pursuant to a

policy or custom of the City of New Rochelle.

WHEREFORE, a judgment is respectfully demanded:

a)    Dismissing the complaint,

b)    Awarding to the defendants reasonable counsel fees against the plaintiff,

c)    Awarding to the defendants the costs and disbursements of this action

against the plaintiff, and

d)    Granting such other, further or different relief to the defendants as the

Court deems just and proper.

Dated:  White Plains, New York
        April 13, 2007

Yours, etc.

WILSON, ELSER, MOSKOWITZ,
    EDELMAN & DICKER LLP
Attorneys for Defendants

By:_____
        Peter A. Meisels (PM-5018)
3 Gannett Drive
White Plains, New York 10604
(914) 323-7000
File No.: 07367.00056

1535281.1

# Answers to Complaints

7:07-cv-01296-CLB Alali v. Gazzola et al
ECF

### U.S. District Court

### United States District Court for the Southern District of New York

## Notice of Electronic Filing

The following transaction was entered by Meisels, Peter on 4/13/2007 at 1:15 PM EDT and filed on
4/13/2007

**Case Name:**      Alali v. Gazzola et al
**Case Number:**   7:07-cv-1296
**Filer:**             Patrick J. Carroll
                    City of New Rochelle, New York
                    Robert Gazzola

**Document Number:** 6

**Docket Text:**
ANSWER to Complaint. Document filed by Robert Gazzola, Patrick J. Carroll, City of New Rochelle,
New York.(Meisels, Peter)

### 7:07-cv-1296 Notice has been electronically mailed to:

Jonathan Lovett     jlovett@lovett-gould.com

Peter Alexander Meisels     meiselsp@wemed.com

### 7:07-cv-1296 Notice has been delivered by other means to:

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=4/13/2007] [FileNumber=3269156-0
] [4e4f75189ee2ab81ea09325992fb25107ccd4245ea32475c9321e2ac061f4098c29
4ddd6b913bacc2fa3827f35c7c6e59e267eb09a0809313c118ebcf558e9cf]]

Rev. January 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

ARAZ ALALI,

                                    Plaintiff(s),                    CIVIL CASE DISCOVERY PLAN
                                                                     AND SCHEDULING ORDER

              - against -
                                                                     07 Civ. 1296 (CLB) (GAY)

ROBERT GAZZOLA, individually,
PATRICK J. CARROLL, individually, and the
CITY OF NEW ROCHELLE, NEW YORK,

                                    Defendant(s).
------------------------------------------------------x

        This Court requires that this case shall be <u>ready for trial</u> on or after October 26, 2007.

        The following Civil Case Discovery Plan and Scheduling Order is adopted, after consultation
with counsel for the parties, pursuant to Rules 26(f) and 16 of the Federal Rules of Civil Procedure.

The case (is) (is not) to be tried to a jury.

Joinder of additional parties must be accomplished by ~~May 18, 2007~~ N/A

Amended pleadings may be filed until ~~May 18, 2007~~ N/A

<u>Discovery:</u>                                                          6/20/07

1.  Interrogatories are to be served by all counsel no later than ~~May 29, 2007~~_____, and
responses to such interrogatories shall be served within thirty (30) days thereafter, The provisions of
Local Civil Rule 33.3 (shall) (~~shall not~~) apply to this case.                    6/20/07

2.  First request for production of documents, if any, to be served no later than_____~~May 29, 2007~~

3.  Depositions to be completed by _____September 18, 2007_____.

        a.      Unless counsel agree otherwise or the Court so orders, depositions are not to be held
                until all parties have responded to any first requests for production of documents.
        b.      Depositions shall proceed concurrently.
        c.      Whenever possible, unless counsel agree otherwise or the Court so orders, non-party
                depositions shall follow party depositions.
        d.      If the defense of qualified immunity from suit as a matter of law has been or will
                be asserted by any defendant(s) with respect to any claim(s) in the case, counsel
                for any such defendant(s) shall, within thirty (30) days of this order ~~depose~~
                plaintiff(s) at least concerning all facts relevant to the issue of qualified immunity.

Within thirty (30) days thereafter defendant(s) shall serve consistent with Local Rule 6.1 and file a motion under Rule 12(c) or Rule 56, returnable on a date posted in the New York Law Journal by Judge Brieant for hearing motions. The motion shall, in the absence of agreement of counsel, be limited to the issue of qualified immunity, and plaintiff(s) version of the events shall be assumed true for purposes of the motion. **Failure to comply with this provision of this Order shall operate as a waiver of the opportunity to resolve the issue of qualified immunity by motion prior to trial.**

4. Any further interrogatories, including expert interrogatories, to be served no later than ~~July 16, 2007~~ 7/20/07

5. Requests to Admit, if any to be served no later than ~~September 21, 2007~~ 8/20/07

6. Additional provisions relating to discovery agreed upon by counsel for the parties (are)(are not) attached and made a part hereof. 10/1/07

7. All discovery is to be complete by ~~October 26, 2007~~

Dispositive motions, if any, must be served on notice as required by Local Civil Rule 6.1, and must be returnable before the Court on a published motion day, no later than three weeks before the ready for trial date.

Next Case Management Conference _November 30, 2007 at 9:00 AM_
(This date will be set by the Court at the first conference)

Joint Pretrial Order is required only if counsel for all parties agree that it is desirable, or the Court so orders.

This case has been designated to the Hon. George A. Yanthis, United States Magistrate Judge at White Plains for discovery disputes if the Court is "unavailable" and for trial under 28 U.S.C. § 636(c) if counsel execute their consent in writing.

Strict compliance with the trial readiness date will be required. This Plan and Order may not be changed without leave of the Court or the assigned Magistrate Judge acting under a specific reference order.

Upon signing a Consent for Trial Before a United States Magistrate Judge, the Magistrate Judge will establish an agreed date certain for trial and will amend this Plan and Order to provide for trial readiness consistent with that agreed date.

SO ORDERED.

Dated: White Plains, New York
May 25, 2007

_Charles Brieant_
Charles L. Brieant, U.S.D.J.